Commonwealth *v.* Globe Indemnity Company, Appellant.

262

Argued April 29, 1936. Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Arthur Littleton,* with him *Alton W. Lick,* of *Hause, Evans, Storey & Lick, Murdoch K. Goodwin* and *Morgan, Lewis & Bockius,* for appellant.

*Grover C. Ladner,* Deputy Attorney General, with him *Charles J. Margiotti,* Attorney General, for appellee.

OPINION BY MR. JUSTICE LINN, June 26, 1936:

The Commonwealth maintained a checking account with Diamond National Bank of Pittsburgh, hereafter called the bank. The bank gave its bond to the Commonwealth conditioned to disburse the deposit on its order. The Commonwealth also took the bond of the Globe Indemnity Company, hereafter called the surety, conditioned for the performance by the bank of its contract. This bond contained a warrant to confess judgment. Alleging breach of the bank's contract, the Commonwealth entered judgment against the surety and assessed damages in a sum of $28,141.83. The surety petitioned for a rule to show cause why the judgment should not be opened to allow the surety to defend. The rule was granted; the Commonwealth answered; a stipulation of facts was filed by both parties and the court discharged the rule. Subsequently the case was opened to permit the parties to take depositions and for oral argument. Depositions were taken and on the record so amended the learned court below again discharged the rule. This appeal followed.

Controlling facts may be stated briefly. Statutes provide for the condemnation and slaughter of tubercular cattle and the payment of compensation for cattle so taken.[1] The department administering the subject prepares papers covering each claim or case; these papers result in action by the auditor general and the state treasurer pursuant to which the treasurer issues the Commonwealth's check to pay the owner of the cattle.

---

[1] Act of June 1, 1915, P. L. 667, 3 PS section 393.

A clerk named Thomas, employed in the department charged with assembling these records, fabricated papers showing amounts payable to various persons as owners of cattle when in fact no claims had been presented or liability accrued. He placed these false papers with valid records that were moving from the department of origin to the fiscal officers charged with duty of drawing checks in payment of lawful claims. This was done in such way that, without discovery of the fraud by the auditor general or the state treasurer, checks were drawn as in the case of valid claims, the alleged claimant in each case being named as payee of the check. In the course of business these checks were sent by mail addressed to the payees at the post-office addresses stated in the papers. After the checks had been mailed, Thomas and a confederate went to the post offices to which this mail had been sent, and, presumably, by representing themselves to be the addressees, obtained the checks. By various methods, not now important, they either negotiated them through a third person, or cashed them at banks other than the drawee bank, or had them collected by other banks, first endorsing the name of the payee. This continued for some time without discovery, according to this record, apparently from January 9, 1928, to and including August 20, 1929. On November 6, 1929, the fraud was discovered. The Commonwealth then, in the words of the agreement of facts, "took steps to gather together all of the checks involved herein, a considerable task involving handling thousands upon thousands of checks and securing only those checks which are the subject of this transaction." On November 23d and again on November 27, 1929, all the checks then found to have forged endorsements were presented to the bank with a request that the Commonwealth's account be credited in the sum of those checks theretofore charged against the account. The request was refused.

Section 9 (3) of the Negotiable Instruments Law of 1901, P. L. 194, 196, 56 PS section 14, provides, "The

instrument is payable to bearer: . . . 3. When it is payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable. . . ." The payees were fictitious or nonexistent persons but that fact was not known to the Commonwealth's fiscal officers who drew the checks. Within the terms of the statute a name is fictitious when it is feigned or pretended, and a nonexistent person is one who does not exist in the sense that he was not intended to be the payee by the drawer. See *Snyder v. Corn Exchange Nat. Bank,* 221 Pa. 599, 606 et seq., 70 A. 876. In drawing the check to the order of the payee the Commonwealth was not intending that an imaginary person or a nonexistent person should as the payee take the check. The checks were therefore not payable to bearer.

Section 23, 56 PS section 28, provides: "When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority." The alleged endorsement of the payee's name was a forgery: *Com. v. Bachop,* 2 Pa. Superior Ct. 294; *Com. v. Smith,* 6 S. & R. 568; the drawer had not intended that Thomas should endorse the payee's name. Being a forgery, section 23 declares that "it is wholly inoperative" and confers "no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto" unless the drawer is estopped. Is the Commonwealth "precluded from setting up the forgery"?

The first proposition presented in appellant's brief is: "The checks when put in circulation by the Commonwealth were not susceptible of a genuine endorsement." The record shows conclusively that that proposition is sound and, as the Commonwealth did not intend to make

the checks payable to any identified person regardless of name, or to a fictitious or nonexistent person, appellant's proposition would seem to end its case.

If the checks were not susceptible of endorsement and the bank nevertheless made payment, it could not debit the drawer's account, and, having violated its contract by doing so, the surety became liable. It also follows that if the checks were not susceptible of endorsement, drawing and mailing them to the addressees, as stated above, could not be the proximate cause of the payment made by the bank. The drawer could not have anticipated that, after they were drawn and mailed, Thomas and his confederate would by misrepresentation get them from the mails and that the bank would honor them. The most ordinary precautions usually expected to be taken by a banker (see *United Security Life, etc., Co. v. Central Nat. Bank,* 185 Pa. 586, 40 A. 97, and particularly the report of the master, Richard C. Dale, at page 591 et seq.) asked to cash or credit the checks would, if taken, have at once disclosed that the holder had no title. It is immaterial that the fraud was initiated by an employee of the Commonwealth: *United Security Life, etc., Co. v. Central Nat. Bank,* supra; *Nat. Union Fire Ins. Co. v. Mellon Nat. Bank,* 276 Pa. 212, 222, 119 A. 910; *Shipman v. Bank,* 126 N. Y. 318, 27 N. E. 371. It is also immaterial that before the discovery of the fraud, the Commonwealth knew that its account had been debited by the bank from time to time with the amount of these checks. The bank must know the drawer's signature, but, generally, it takes the risk of the payee's endorsement; with that the drawer has nothing to do unless he makes some representation with regard to it and none was made here. The drawer, assuming the burden of proof of such facts, may show mistake or fraud in the debits to his account made by the bank. In this case the facts are clear.

It is also said that the Commonwealth was negligent in giving notice. As to forged endorsements the rule is

that notice must be given promptly. That of course varies with the circumstances. Here the fact stipulated is that "thousands upon thousands of checks" had to be examined to select those involved; it required, as to one batch, 17 days, and as to another, 21 days. In the circumstances that was prompt notice. See *McNeely Co. v. Bank of North America,* 221 Pa. 588, 70 A. 891; *Connors v. Old Forge Discount and Deposit Bank,* 245 Pa. 97, 91 A. 210; *Lesley v. Ewing,* 248 Pa. 135, 93 A. 875.

The facts bring the case so clearly within the portions of the Negotiable Instruments Act quoted above that reference to decisions seems unnecessary but in view of the argument of the learned counsel for the appellant that under *Marcus v. People's Nat. Bank,* 57 Pa. Superior Ct. 345, and *Market St. Title & Trust Co. v. Chelten Tr. Co.,* 296 Pa. 230, 236, 145 A. 848, the Commonwealth is not entitled to recover, a word may be said about them.

It is impossible to consider the decision in the *Marcus* case consistent with the Negotiable Instruments Act. Marcus dealt with Moskovitz, who represented to him that a client named Kirst owned real estate and wished to borrow money on it. Marcus agreed to lend. Upon receipt of a bond and mortgage apparently signed by Kirst, Marcus drew his check to the order of Kirst and handed it to Moskovitz for delivery to his client. Kirst was nonexistent. Moskovitz endorsed Kirst's name on the check and also his own; the bank then paid the check. As soon as Marcus learned of the fraud, he demanded that his account be corrected and on the bank's refusal, brought suit. A nonsuit was entered by the trial court and was affirmed in the Superior Court. It was held that Marcus could not recover; apparently, as we understand it, that he was precluded from making the defense of forgery. The court said, "The whole transaction was between the plaintiff and Moskovitz so far as the pretended lending of money and the payment by the plaintiff to the borrowers were concerned. The effect of the drawing of the checks on the bank was an

implied representation by the drawer that the payees were existing persons and yet there could not be a genuine endorsement of such papers. It is not reasonable to charge the bank with the consequences of the payment of a forged endorsement when the plaintiff put in circulation checks which were not susceptible of a genuine endorsement." It is to be noted that Marcus did not draw his check to the order of Moskovitz and did not intend that Moskovitz should be the payee. He intended that Kirst should be the payee and so stated on the check. He had been told, falsely, as it turned out, that Kirst was an existing person who made the mortgage and was entitled to the money. Marcus therefore did not intend to name, and did not know that he was naming a fictitious or nonexistent person and therefore under section 9, subsection 3, the check was not to be regarded as payable to bearer. The mistake he made was not an act which precluded him from setting up the forgery. Indeed, if the bank had kept its contract by proper investigation before payment, Marcus would have been saved from the consequences of his mistake. That case must be considered disapproved.

The appellant also relies on *Market St. Title & Tr. Co. v. Chelten Tr. Co.,* 296 Pa. 230, 145 A. 848, in which a check was erroneously drawn by a bank to a named payee when another payee was in fact entitled. It was a controversy between a bank that drew its own check and a bank which collected the check and the actual decision does not help the appellant. The bank drew its check in the course of a real estate settlement but, instead of making it payable to the person entitled to the money, by some mistake named another payee and sent the check by mail to the address of the payee who collected the money. The payee was neither fictitious nor nonexistent. The drawer's intention, so far as expressed on the face of the check, and by the fact of mailing it, was that the payee should receive the proceeds. On this point, also, the appellant relies on *States v. First Nat. Bank of*

*Montrose,* 17 Pa. Superior Ct. 256, and 203 Pa. 69, 52 A. 13, a transaction arising prior to the passage of the Negotiable Instruments Act. In that case a draft was drawn to a person who was dead although the drawer was not aware of it. He mailed the draft to what he supposed was the address of the payee. It was received by another person who forged the name of the payee and collected the draft. Four years after he discovered the fraud the drawer brought an action against the bank; recovery was denied; the only ground upon which the decision can be justified is that the drawer sued too late.

It is also obvious from what has been said that the cases of impersonation, the so-called "imposter" cases, do not help appellant. They depend on the drawer's intention, a test applied by the weight of authority;[2] the drawer is precluded (section 23) by that. If a particular person is intended and designated as payee, it is immaterial to the drawer by what name he is called; he may endorse and payment to him will be good (as was decided in *Land Title & Tr. Co. v. Northwestern Nat. Bank,* 196 Pa. 230, 46 A. 420) because such payment accords with the drawer's intention. But if any intention may be attributed to the Commonwealth in drawing and mailing the checks involved in this case, it is limited by what was stated on the check and by mailing it; there was here no additional evidence of intention such as handing the check to the person intended as, for example, in *Land Title & Tr. Co.'s* case, which precluded the drawer from asserting that it intended the payee to be the person who owned the property and not the person who was present àt the settlement, answering to the name of and claiming to be the owner. Compare *Real Estate, etc., Co. v. United Security Trust Co.,* 303 Pa. 273, 154 A. 593.

The judgment is affirmed.

---

[2] *Brannan, Negotiable Instruments Law,* 5th edition, page 311.