## Johnson, Appellant, *v.* First National Bank of Beaver Falls.

Argued March 20, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Joseph A. Rieser,* for appellants.

*Leonard L. Ewing,* with him *Reed, Ewing & Ray,* for appellee.

OPINION BY MR. JUSTICE JONES, May 25, 1951:

The plaintiffs, husband and wife, sued to recover a sum allegedly standing to their credit, as joint de-

positors, in a checking account in the defendant bank. The complaint averred that, after various deposits made by the plaintiffs to the credit of the account and withdrawals therefrom from time to time, there should have been a net balance in the account to the plaintiffs' credit in the month of October 1948 of $3153; that the plaintiffs made demand therefor; and that the defendant refused to pay the plaintiffs that sum or any portion thereof. The defendant answered, denying that anything was due the plaintiffs, and averred, under new matter, that the plaintiffs had received payment in full as shown by the bank's ledger sheet of the account which began with an entry of October 23, 1947, crediting the plaintiffs with a balance brought forward of $3278. Subsequent entries of deposits and withdrawals appear on the ledger sheet until October 4, 1948, at which time the withdrawal shown reduced the balance in the account to $.00 There were, all told, in the period of time covered by the ledger sheet twenty-three withdrawals by checks purportedly drawn by one or the other or both of the plaintiffs. In their reply to the new matter, the plaintiffs averred that only six of the withdrawals had actually been made by them and that seventeen of the checks charged to their account, for an aggregate sum of $3153, were forgeries.

At trial, the plaintiffs proved that all seventeen of the contested checks were forgeries, and the jury expressly so found in a special verdict. The defendant offered no proof of the genuineness of the signatures to the checks involved and no longer questions that they were forgeries. It so happened, however, that the last two of such checks were cashed by the bank after the plaintiffs had knowledge of the "irregularity" in their account and, because they did not notify the bank accordingly when they first obtained such knowledge, the jury relieved the bank of liability for the payment of those checks and returned a verdict for the plain-

tiffs in the sum of $2770. The verdict represented the amount paid out by the bank on the other fifteen forged checks all of which had been cashed by the bank before the plaintiffs knew, or had reason to know, that such checks had been charged to their account. The defendant moved for judgment n.o.v. on the ground that the plaintiffs had failed to give the defendant prompt notice of the forgeries and were thereby precluded from setting them up. The court below granted the motion and entered judgment for the defendant from which the plaintiffs brought these separate appeals.

Section 23 of the Negotiable Instruments Law of May 16, 1901, P. L. 194 (56 PS §28), provides that "When a signature is forged . . . it is wholly inoperative, and no right . . . to enforce payment thereof against any party thereto, can be acquired through or under such signature, *unless the party against whom it is sought to enforce such right is precluded from setting up the forgery* . . ." (Emphasis supplied). The word "precluded", as used in Section 23 of the N. I. L., has been construed in this State, as well as elsewhere, to mean "estopped" which necessarily connotes harm or at least unfairness, otherwise, to the one asserting the estoppel. In *Commonwealth v. Globe Indemnity Company,* 323 Pa. 261, 266, 185 A. 796, Mr. Justice LINN, speaking for this court, said with respect to the effect of a forgery,—"Being a forgery, section 23 declares that 'it is wholly inoperative' and confers 'no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto' *unless the drawer is estopped*" (Emphasis supplied). In *First National Bank of Shoemakersville v. Albright,* 111 Pa. Superior Ct. 392, 397-398, 170 A. 370, Judge (later Mr. Justice) PARKER said,—"We understand that the word 'precluded' as used in the Act of 1901 is equivalent to 'estopped.'" In such connection, the same opinion further stated

that "negligence is treated as a ground of estoppel" and that this is but " '. . . an application of the general principle that when one of two innocent persons, that is, persons each guiltless of an intentional, moral wrong, must suffer a loss, it must be borne by that one of them who by his conduct has rendered the injury possible': 10 R. C. L. 695." See also *Clearfield National Bank v. Madera National Bank,* 87 Pa. Superior Ct. 564, 568; and, generally, Brannan, Negotiable Instruments Law, 7th Ed., §23, p. 455.

Among the acts of negligence capable of estopping a depositor from recovering from his bank for its payment of a check bearing the depositor's forged signature is his failure to promptly notify the bank of the forgery: see *McNeely Company v. Bank of North America,* 221 Pa. 588, 592, 70 A. 891, where it was said that "The duty of a depositor in a bank, upon discovering that it has paid and charged to his account either a check bearing his forged signature as drawer or his check on the forged indorsement of the payee, is to promptly notify it of the forgery." However, as we later had occasion to note, what constitutes prompt notice "varies with the circumstances" of each case: *Commonwealth v. Globe Indemnity Company,* supra. The *McNeely* case, itself, had impliedly so recognized. In *Iron City Nat. Bank v. Fort Pitt Nat. Bank,* 159 Pa. 46, 28 A. 195, Mr. Justice MITCHELL had said that, *short of an equitable estoppel* in favor of a bank which has paid out the proceeds of a check bearing a forged endorsement, "the date of the notice is not material." With reference to that statement, it was observed in the *McNeely* case that "This must be read with reference to the facts in that case." And, of course, that is so in any case.

In view of the meaning judicially imputed to the word "precluded", as employed in Section 23 of the Negotiable Instruments Law, "timely" rather than

"prompt" more correctly defines the character of notice which a depositor is required to give his bank of a forged check charged to his account. In the nature of things, there can be no arbitrary standard as to the length of time within which a depositor, after discovering that his bank has charged a forged check to his account, must give the bank notice thereof in order that he may not be precluded from setting up the forgery. Consequently, the cases, such as the appellee cites, where delays of specified periods of time in notifications were fatal to depositors' claims for recovery, are in no sense controlling.[1] Conceivably, in certain situations a far shorter period of time than that given in the appellee's citations might even be too late. The issue as to the timeliness of the notice is one of fact to be so resolved according to the relevant and material attendant circumstances.

What was said in the *McNeely* case with respect to a depositor's duty to give his bank *prompt* notice that it had paid and charged to his account a forged check was, in reality, superfluous to the decision in that case. There, the admitted facts and undisputed documentary proofs conclusively showed such a negligent course of conduct on the part of the depositor with respect to its regularly returned checks over a period of six years that the depositor's recovery for the bank's payment of forged checks during that long time was precluded as a matter of law. No substantial question as to the promptness of any notice was involved. There was no room for doubt that the bank had not been promptly notified of the forgeries. The question which the plain-

---

[1] E. g. *Lesley v. Ewing*, 248 Pa. 135, 93 A. 875, a delay of two months; *Connors v. Old Forge Discount and Deposit Bank*, 245 Pa. 97, 91 A. 210, a delay of six weeks; and *Knights of Joseph Building and Loan Association v. Guarantee Trust & Safe Deposit Co.*, 69 Pa. Superior Ct. 89, a delay of five weeks.

tiff's claim actually posed in the *McNeely* case was whether the bank was not liable for the payment of forged checks regardless of the lack of prompt notice of the forgeries. That question was ruled adversely to the plaintiff on a principle deduced from *United Security Life Insurance and Trust Company v. Central National Bank,* 185 Pa. 586, 40 A. 97, that "The law assumes, and does not find it necessary to conduct an inquiry to verify the assumption, that had the notice been given promptly, the [bank] might have taken steps to protect itself as against [the forger]": see the *McNeely* case at p. 598. It should not be overlooked, however, that the *United Security Life Insurance* case, supra, was decided three years before Pennsylvania's adoption of the Negotiable Instruments Law and that the *McNeely* case did not even mention Section 23.

While a depositor's failure to give his bank timely notice that forged checks have been charged against his account "is a good defense . . . the bank has the burden of proof" (*Peoples City Bank v. John Hancock Mutual Life Insurance Company,* 353 Pa. 123, 131, 44 A. 2d 514) of its lack of knowledge in such connection, free from any fault of its own. That is so as a matter of contract (and not tort) law which is applicable to the debtor-creditor relationship. In an interesting and well-considered opinion in *R. H. Kimball, Inc. v. Rhode Island Hospital National Bank,* 72 R. I. 144, 153-154, 48 A. 2d 420, Mr. Chief Justice FLYNN, speaking for the Supreme Court of Rhode Island, said, —". . . in the absence of any contract limitation and where payment by the bank of a forged check has been unquestionably established, there is ample authority that the bank must then affirmatively show that it had exercised due diligence in its transactions with the forger before it can put in issue the depositor's alleged negligence. The substance of that rule is stated or applied in 7 Am. Jur. 371, §516; *National Dredging Co.*

*v. Farmers Bank,* 6 Penn. (Del.) 580; *Basch v. Bank of Am. Nat. Trust & Savings Ass'n.,* 22 Cal. 2d, 316; *Wussow v. Badger State Bank,* 204 Wis. 467. See *Critten v. Chemical Nat. Bank,* 171 N. Y. 219; *Leather Manufacturers' Bank v. Morgan,* 117 U. S. 96. In the event that the bank is found, upon the evidence, to have been negligent in the performance of its duty, the bank becomes liable because of its primary contractual obligation and not because of its negligence."

In the instant case the learned court below fell into error both procedurally and substantively. It passed upon the defendant's motion for judgment n.o.v. in the mistaken belief that it was incumbent upon the plaintiffs, in the first instance, to establish that they had given the bank timely notice of the forgeries and ignored the primary duty of the bank to show itself free from negligence before the plaintiffs could be precluded by any failure of theirs in the premises.

There is evidence in the case that, when Johnson got his returned checks on September 20th, they were handed to him in two envelopes, one containing five authentic checks drawn by the depositors throughout the eleven months preceding and the other envelope containing fifteen forged checks all drawn to the order of the same payee, viz., the forger, in the preceding six weeks. From the bank's separation of the checks, the jury could infer that it had already detected the spurious ones and had so segregated them. The bank's denial of the testimony as to the two envelopes was merely general on the basis of custom and not specific to the issue. Then, too, the action of the forger in making good, at the teller's request, a relatively large overdraft in the account occasioned by his last withdrawal on a forged check was so unusual as to cause a reasonably prudent person to question the regularity of the transaction and thus, perhaps, discover the forgeries. The question of the defendant's negligence was

for the jury. Under the evidence, it cannot be said as a matter of law that the defendant was not guilty of a want of care.

Even the evidence which the defendant offered in an effort to show lack of timely notice of the forgeries by the depositors was entirely oral. Its credibility and weight were for the jury's appraisal and determination. The fact that the depositors knew within a week of receiving their bank statement and returned checks on September 20th that forgeries had been charged to their account and did not at once so notify the bank did not preclude the plaintiffs from setting up the forgeries if the bank knew or, by the exercise of reasonable care, should have known of them. In any view, therefore, the case was properly for the jury.

Judgment reversed and here entered for the plaintiffs on the verdict.

———

DISSENTING OPINION BY MR. JUSTICE HORACE STERN:

Judgment for defendant n. o. v. was entered in the Court of Common Pleas of Beaver County by the trial judge, F. CORTEZ BELL, and Judges ROBERT E. MC-CREARY and MORGAN H. SOHN, sitting en banc. Believing, as I do, that the conclusion reached by that court was correct, I must dissent from our present action in reversing it.

It seems to me that both facts and law are stated in the majority opinion very inadequately.

First as to the facts,—and in that connection I shall rely only upon the testimony of plaintiffs themselves.

The forger, William Jackson, was the son of plaintiff Fannie L. Johnson and the step-son of plaintiff A. A. (Alexander) Johnson, and he made his home with them. The checks for the bank's payment of which they obtained a verdict were forged by Jackson in the period

from July 23 to September 18, 1948. Plaintiffs had gone south on a vacation trip on July 23 and Johnson testified that when they left on that day there was a balance in their joint checking account of $3,723; after their return they made deposits in August aggregating $135, so that when, on September 20, Johnson visited the bank to get a statement of their account he knew that the balance to their credit should have been $3,858. The clerk told him, however, that the balance was then only $1,188 (Johnson so testified; the correct amount was actually $1,088). Thus faced with what must have been to him a staggering revelation, Johnson contented himself by merely remarking to the clerk: "I know I had more money than that"; he also claims to have said: "I say the money is misappropriated". He apparently had immediate (but unexpressed) suspicions as to the reason for the shortage because he then and there transferred $738 from the checking account into a savings account in his own name,—obviously to prevent future shrinkages,—and immediately upon reaching home and examining the cancelled checks which he had received from the bank he sent for Jackson and opened conversation with him by the accusatory question: "What did you mean by doing a thing of that kind?" Jackson at once confessed to the forgeries and asked for three days time in which to see if he could restore the money and afterwards for additional time in order to consult relatives in Chicago to see if they could help him out. His efforts in that direction failing, Johnson and Jackson entered into a written agreement on September 28 in which Jackson agreed to pay $2,700, the then approximate amount of the forgeries, in instalments of $75 every two weeks. All that he was able to pay under this agreement, however, was $40, and finally, on November 16, Johnson had him arrested; he was bound over by the Alderman for court; he pleaded guilty and was sentenced on Decem-

ber 8 to a term in the penitentiary. Meanwhile John-son visited the bank some time around the middle of October. Inquiring as to the balance then in the account he was told that there was no balance; (the $350 remaining on September 20 had been drawn out the first week of October on two additional forged checks). He thereupon went to the cashier and said to him: "Mr. Luce, there's $3120 of my money gone, *for what reason I don't know.*" This was a palpable falsehood, for, as already stated, Jackson had confessed the forgeries to him on September 20; he did not tell the cashier the truth, namely, that, as he knew, the money had been obtained by his step-son on forged checks, that he had been trying to have him make restitution, and that he had actually entered into a written agreement with him for that purpose. Johnson's final visit to the bank was in company with his wife and his attorney sometime after Jackson had been sentenced on December 8, when they made demand on the bank preparatory to beginning the present suit.

So much for the facts. As far as the law is concerned, there can be no question but that, by an overwhelming number of decisions both in this Court and the Superior Court, three principles have been firmly established. The first is that, when a depositor has knowledge that a bank has improperly paid out moneys in his account on forged checks, it is his duty—and the sine qua non of his right of recovery against the bank—to give the bank *prompt* notice of the forgeries. The majority opinion undertakes to say that the word " 'timely' rather than 'prompt' more correctly defines the character of notice which a depositor is required to give his bank of a forged check charged to his account". Apart from the fact that the word "timely" is wholly too vague in connotation to be capable of legal application, the fact is that in no single adjudicated case has the required notice been held to be one that is mere-

ly "timely"; on the contrary, *all* the cases explicitly hold that *prompt* notice must be given.[1] The second established principle is that, on fixed or conceded facts, the question as to whether notice of the forgeries measures up to the required standard of promptness is one for the determination, not of the jury, but of the court as a matter of law.[2] The third principle is

---

[1] *States v. First National Bank of Montrose*, 203 Pa. 69, 74, 52 A. 13, 15; *McNeely Co. v. Bank of North America*, 221 Pa. 588, 592, 594, 70 A. 891, 892; *Connors v. Old Forge Discount and Deposit Bank*, 245 Pa. 97, 99, 91 A. 210, 211; *Marks v. Anchor Savings Bank*, 252 Pa. 304, 309, 97 A. 399, 400; *Showers v. Merchants National Bank*, 293 Pa. 241, 243, 142 A. 275; *Reimel v. Northwestern Trust Co.*, 298 Pa. 503, 508, 148 A. 706, 707; *Commonwealth v. Globe Indemnity Co.*, 323 Pa. 261, 267, 268, 185 A. 796, 799; *Peoples City Bank v. John Hancock Mutual Life Insurance Co.*, 353 Pa. 123, 131, 44 A. 2d 514, 518; *Murray v. Real Estate Title Insurance & Trust Co.*, 39 Pa. Superior Ct. 438, 440, 441, 443; *Knights of Joseph Building & Loan Association v. Guarantee Trust & Safe Deposit Co.*, 69 Pa. Superior Ct. 89, 92, 93; *Almar Building & Loan Association v. Broad Street Trust Co.*, 111 Pa. Superior Ct. 49, 51, 54, 169 A. 262, 263; *Boosel v. Agricultural Insurance Co.*, 118 Pa. Superior Ct. 400, 404, 180 A. 21, 23; *Interstate Hosiery Mills, Inc. v. First National Bank of Lansdale*, 139 Pa. Superior Ct. 181, 186, 189, 190, 191, 11 A. 2d 537, 540, 541, 542.

The majority opinion says that "What was said· in the *McNeely* case with respect to a depositor's duty to give his bank *prompt* notice that it had paid and charged to his account a forged check was, in reality, superfluous to the decision in that case." This attack on the *McNeely* case as authority for the proposition that *prompt* notice of the forgery must be given loses sight of the fact that that case has been cited with approval and followed in the many decisions enumerated in this footnote.

[2] *Marks v. Anchor Savings Bank*, 252 Pa. 304, 310, 97 A. 399, 401; *Reimel v. Northwestern Trust Co.*, 298 Pa. 503, 508, 148 A. 706, 707; *Murray v. Real Estate Title Insurance & Trust Co.*, 39 Pa. Superior Ct. 438, 444; *Knights of Joseph Building & Loan Association v. Guarantee Trust & Safe Deposit Co.*, 69 Pa. Superior Ct. 89, 93; *Interstate Hosiery Mills, Inc. v. First National Bank of Lansdale,* 139 Pa. Superior Ct. 181, 188, 11 A. 2d 537, 541.

that it is not necessary for the bank to show that if the notice of the forgeries had been given promptly it might have been better able to protect itself by obtaining reimbursement from the forger or his relatives or friends; on the contrary, the failure of the depositor to give prompt notice absolves the bank of all liability irrespective of whether or not it has thereby suffered any disadvantage or loss.[3]

Although I have thus attempted to marshal the authorities in order to show that the law here applicable is firmly fixed and not in the doubtful or vulnerable state which the discussion in the majority opinion would seem to attribute to it, the question as to *when* notice of the forgeries should have been given in the present case is really academic, because, under plain-

---

[3] *United Security Life Insurance & Trust Co. of Pennsylvania v. Central National Bank of Philadelphia*, 185 Pa. 586, 596, 40 A. 97; *McNeely v. Bank of North America*, 221 Pa. 588, 594, 595, 70 A. 891, 892, 893; *Lesley v. Ewing*, 248 Pa. 135, 139, 93 A. 875, 876; *Union National Bank v. Franklin National Bank*, 249 Pa. 375, 389, 94 A. 1085, 1089; *Marks v. Anchor Savings Bank*, 252 Pa. 304, 307, 308, 97 A. 399, 400; *Murray v. Real Estate Title Insurance & Trust Co.*, 39 Pa. Superior Ct. 438, 441, 442; *Knights of Joseph Building & Loan Association v. Guarantee Trust & Safe Deposit Co.*, 69 Pa. Superior Ct. 89, 93; *Interstate Hosiery Mills, Inc. v. First National Bank of Lansdale*, 139 Pa. Superior Ct. 181, 187, 11 A. 2d 537, 540.

The majority opinion says that the *United Security Life Insurance & Trust Co.* case was decided three years before Pennsylvania's adoption of the Negotiable Instruments Law, the intimation being that in some way or for some reason the Negotiable Instruments Law outmoded it. This attack on that case as authority for the proposition that it does not avail the depositor to show that even if notice *had* been given promptly the bank would not have been better off, ignores the fact that the *United Security Life Insurance & Trust Co.* case has been followed in the many decisions enumerated in this footnote, all of which have been subsequent in time to the adoption of the Negotiable Instruments Law.

tiffs' own testimony, they never gave to the bank *any* notice other than their attorney's demand in December made as a basis for legal action. As previously stated, when Johnson learned of the balance in the checking account on September 20 he "told the lady" that "he knew he had more money than that",—testimony which he afterwards amplified by adding that he said also: "the money is misappropriated." Can it be seriously argued that these statements constituted a notice to the bank of the forgery of checks? Indeed what the law requires by way of notification is not only that money has been paid out by the bank on forged checks but a specific pointing out to the bank of the check or checks as to which forgery is claimed, because the sole object of the notice is to enable the bank to take measures against the forger of such a check or checks in order to secure, if possible, the restoration of the funds. The law goes even further, for it requires that not only must such specific notice be given, but that the depositor, at the time of notifying the bank of the forgery, must, on demand, return the particular check or checks in question to the bank: *Roth v. Crissy,* 30 Pa. 145; *Rick v. Kelly,* 30 Pa. 527; *Showers v. Merchants National Bank,* 293 Pa. 241, 243, 142 A. 275, 276; *Interstate Hosiery Mills, Inc. v. First National Bank of Lansdale,* 139 Pa. Superior Ct. 181, 190, 191, 11 A. 2d 537, 542. "Misappropriation" of money can take place in very many ways other than by honoring forged checks, and a general statement that "money is misappropriated" is a far cry from informing the bank that it has paid out money on certain checks having forged signatures or endorsements. I venture to say that there is not a single case in the books—at least I have not been able to find any—which holds that the requirement that notice of forgery be given to the bank is satisfied by anything short of a notice that specified or designated checks, re-

turned by the bank to the depositor as paid, were forged, thereby enabling the bank to proceed against the forger to whom the improper payment or payments had been made. The fact is, therefore, that, although Johnson admits that on September 20 Jackson confessed the forgeries, never from that time until demand and notice of suit nearly three months later did plaintiffs give the slightest intimation to the bank that any forgeries had been committed. On the contrary, Johnson, in October, told the bank that $3,120 of his money was gone, *for what reason he did not know*. Thus, instead of *notifying* the bank of the forgeries which his step-son had confessed to him on September 20 and of his efforts since then to recover reimbursement, he carefully *concealed* those facts from the bank, even to the extent of deliberate falsification. The reason for this conduct on his part is so obvious that he that runs may read. Jackson was plaintiffs' wayward son, and they naturally did not want to expose him to prosecution by the bank if the matter could otherwise be adjusted,—a result that they tried in vain to accomplish. While their tenderness toward him may be understood and even viewed with sympathy, certainly, having adopted that course, they cannot months afterwards come for redress upon the bank whose hands they had meanwhile kept tied, partly by means of concealment and partly by actual misrepresentation.

The majority opinion suggests that no notice to the bank was required because the jury may have found that the bank had knowledge of its own of the forgeries.[4] This proposition rests upon two alleged incidents. The one is, as Johnson testified, that when the cancelled checks were returned to him by the bank on

---

[4] It is significant that no request was made by plaintiffs' counsel to submit such a question, nor was it submitted, to the jury.

September 20 they were handed to him in two envelopes, one containing 5 checks drawn by plaintiffs themselves prior to July 23, and the other containing the 15 checks subsequent to that date which Jackson had forged. Assuming this testimony to be true, in spite of its inherent improbability, the inference is attempted to be drawn therefrom that the bank thereby *showed that it knew* that the 15 checks were forged. In the first place, it may be asked how the bank could possibly have possessed such knowledge on September 20, when there is not the slightest suggestion in the record of anything which could have given it such knowledge, especially in view of the fact that it had honored one of the forged checks only two days before. In the second place, it may also be asked what reason could there be for such action on the part of the bank? What purpose of its own, intelligent or otherwise, could it have served? And if, for some non-understandable reason, it wished to call Johnson's attention to the 15 checks as distinguished from the other 5 as having been forged, why should it have resorted to such pantomimic a method as handing him the checks in two envelopes instead of informing him directly of the fact? In the third place,—and this certainly should be conclusive,—if the bank knew on September 20 of the forgeries, would it have honored the two checks presented by Jackson two weeks later,—the one on October 1 and the other on October 4? Indeed the jury itself must have found that the bank had neither knowledge nor notice of the forgeries prior to its honoring the October checks for it did not allow plaintiffs a recovery for the bank's payment of those checks.[5]

[5] It may parenthetically be noted that the verdict of the jury shows a complete misunderstanding on their part of the judge's charge in regard to the necessity of notice, for obviously if plaintiffs were not entitled to recover on the October checks because

The other incident referred to in the majority opinion is that, by the bank's paying to Jackson the amount of the October 4 check of $180, plaintiffs' account became overdrawn to the extent of $33, and that amount was refunded to the bank by Jackson. The majority opinion states that it was such an unusual transaction for Jackson to make good the overdraft instead of the bank calling on plaintiffs to do so, that this ought to have caused the bank to question the regularity of the transaction. The fact is, however, which the majority opinion neglects to state, that, after Jackson cashed the check of October 4, he came back to the bank *that very same day* and presented an additional check, whereupon the clerk, finding that the account had just been overdrawn, called Jackson's attention to that fact, whereupon Jackson promptly paid the $33, and, of course, the additional check was not honored. Since it is plain, therefore, that the bank was *immediately* reimbursed and never had an opportunity, or any occasion, to notify plaintiffs of the overpayment, the incident loses all significance as one from which an inference could be drawn of any suspicious irregularity, much less that the bank knew, or should have known, that any of the checks had been forged.

By way of summary I conclude by saying that while, of course, the bank was bound, by implied contract, to pay out funds on plaintiffs' account only on their genuine checks, the law imposed a correlative duty on the plaintiffs as depositors, after discovering any forgeries, to notify the bank thereof—whether "promptly" or "timely" in this case makes no difference because, not only was no such notice *ever* given, but, on the con-

---

of not having given proper notice of the forgeries they were not entitled, a fortiori, to recover on the earlier checks. From every possible viewpoint, therefore, the verdict of the jury was indefensible.

476

trary, it was *deliberately* withheld. Furthermore, there is not a scintilla of evidence from which the jury could have been allowed to find that the bank had independent knowledge of the forgeries which excused the plaintiffs from giving it the notice otherwise required by law. To my mind the opinion filed by the court below accurately stated the law and correctly applied it to the facts, and I believe that our present decision unjustly imposes a liability upon the defendant bank contrary to the principles set forth in all of our adjudicated cases. I would therefore affirm the order of the court below directing the entry of judgment in defendant's favor.

Mr. Justice BELL and Mr. Justice CHIDSEY concur in this dissenting opinion.

