COMPANIA DE AGUACEROS, S. A.,
Plaintiff,

v.

The FIRST NATIONAL CITY BANK,
Defendant.

Civ. No. 5863.

District Court, Canal Zone,
Division Balboa.

Aug. 11, 1966.

Henry L. Newell, Balboa, Canal Zone, for plaintiff.

L. S. Carrington, Balboa, Canal Zone, Guillermo Jurado, Panama, Republic of Panama, for defendant.

## FINDINGS OF FACT

CROWE, District Judge.

1. The plaintiff, Compania de Aguaceros, S. A., is a Panamanian corporation engaged in the sale of airlines and airplanes and it was founded in 1958 by Gaston Faraudo, Joseph M. Silverthorne, and Heriberto Sanchez.

2. The defendant, The First National City Bank, is a national banking association organized and authorized to do business under the laws of the United States of America and has qualified to do business and is doing business in the Canal Zone and in the Republic of Panama. It maintains in both jurisdictions branch banks or offices where it transacts general and international banking business and accepts and maintains deposits and private accounts.

3. At the time of the formation of the plaintiff company in 1958, a bank account was opened in the name of Compania de Aguaceros, S. A. at the downtown branch in Panama City, Republic of Panama, on May 23, 1958, and the account was later transferred for convenience of the plaintiff to the Exposicion Branch in the same city.

4. Gaston Faraudo was the secretary of the plaintiff corporation and he was also sole owner of a company that was in the business of keeping the books and acting as resident agent under the law of Panama for other corporations. This company is Farca, S. A. (generally known as Farcasa.) Farcasa became the resident agent of the plaintiff and just be-

fore the death of Gaston Faraudo, he sold it to Carlos Echeverria who continued the relationship with plaintiff. Echeverria became the secretary of the plaintiff by vote of the corporation, but he had never been "protocolized" in compliance with Panama law during the events in question.

5. Farcasa's office was maintained in the same building as the defendant's "Exposicion Branch", where the account of plaintiff was kept, and the plaintiff had authorized the forwarding of its bank statements to post office box 6495 in Panama City, which was the same box number as that of Farcasa.

6. Mr. J. M. Silverthorne is the treasurer of the plaintiff company and was the only person authorized to sign checks withdrawing funds from the account during the time in question. ·

7. The duties of Farcasa were quite simple as plaintiff never did any business in Panama, and consisted of keeping records on the sale of an airline and the sale of about four aircraft in Latin America, plus the preparation of tax forms for plaintiff in various Latin countries. The records of plaintiff were not complicated and could be reviewed by J. M. Silverthorne in approximately fifteen or twenty minutes.

8. Mr. Silverthorne at all times pertinent to the issue was a resident of the Republic of Honduras and came to Panama from three to six times a year at which times he would visit the Farcasa office and examine the books and bank statements which were kept in that office.

9. Carlos Echeverria, as secretary, was not authorized to sign checks on the bank account of plaintiff, but the monthly statements, cancelled checks, reports of annual audits, and all correspondence from defendant to plaintiff were sent to the address of plaintiff recorded in the files of the bank, which was box 6495, Panama City.

10. On January 18, 1962, Carlos A. Echeverria wrote on the plaintiff's letterhead that plaintiff had entered into a contract in Honduras whereby it would receive $7,500.00 every month which would be turned over to the Banco Atlantida of Honduras for transmittal to defendant to be credited to the current account of plaintiff. The letter asked defendant to "give us notice of said credits" and the letterhead carried the address: P. O. Box 6495. The letter was signed "Compania de Aguaceros, S. A." with the handwritten signature of C. A. Echeverria below and "Carlos A. Echeverria" typed below the signature.

These funds were deposited to plaintiff's account regularly beginning on January 21, 1963 in the sum of $7,500.00 through April 20, 1964, with the exception that on November 21, 1963 the deposit was for $7,495.95 instead of $7,500.00. There were other funds in the account and another deposit was made for $29,482.57 on February 18, 1964, but no showing is made that Echeverria had anything to do with them.

Very few withdrawals were made from the account during 1963. In the months of January, March, May, June, July and August no checks were cashed against the account and there was little activity in the other months until the checks involved in this action were presented.

11. J. M. Silverthorne was in Panama and visited Farca, S. A. in October, 1963 and did not return until March 18, 1964. When he left in October, plaintiff's account was in good order but on March 19, 1964, he went to defendant's "Exposicion" branch to establish a letter of credit and while there asked for the balance in the account of Aguaceros. He found the account low and determined by examining copies of the checks maintained by the bank that nine of the checks were forgeries and that they had been issued beginning in October, 1963. On March 20, 1964, he wrote a letter to the Manager, First National City Bank, La Exposicion Branch, Panama, Republic of Panama, advising him that nine checks totaling $44,000.00 that were cashed on plaintiff's account on dates ranging from

October 11, 1963 through February 25, 1963 (actually 1964 as shown by the checks) were not issued or signed by the writer and asking that an investigation be made.

12. The checks were as follows:

| Amount | Date | Payable to |
| --- | --- | --- |
| $7,500.00 | October 7, 1963 | Importaciones Exclusivas, S. A. |
| $5,000.00 | October 26, 1963 | Importaciones Exclusivas, S. A. |
| $2,500.00 | November 17, 1963 | Portador (bearer) |
| $3,500.00 | November 30, 1963 | Cash |
| $6,000.00 | December 9, 1963 | Importaciones Exclusivas, S. A. |
| $2,500.00 | December 30, 1963 | Cash |
| $3,000.00 | January 7, 1964 | Cash |
| $5,000.00 | February 10, 1964 | Cash |
| $9,000.00 | February 21, 1964 | Importaciones Exclusivas, S. A. |

Four of the checks as shown were made payable to Importaciones Exclusivas, S. A., a company wholly owned by Carlos Echeverria and were endorsed with that company's stamp. Four were made payable to "Cash" and bore the signature of C. A. Echeverria as the endorsement and one was made payable to "Portador" (bearer) and bore the signature of Carmen I. Rodriguez as endorsement. Carmen I. Rodriguez was at the time secretary of Farca, S. A.

All of the checks had been honored and paid by the defendant and deducted from the plaintiff's account.

13. The checks were forged by Carlos Echeverria and the signatures of J. M. Silverthorne were so well done that they were passed as authentic by the bank's signature control personnel and even the experts at the trial were not in agreement. Echeverria confessed the forgeries to J. M. Silverthorne and burned the original checks. Photographs of the checks only were available to the handwriting experts and for this reason a proper determination by them was somewhat hampered. Silverthorne admitted that the signatures were excellent and very hard for him to distinguish from his own.

14. The signature control personnel who passed upon the validity of the checks were employees of the defendant of several years' standing and were customarily employed in the section which controls signatures.

15. Two of the forged checks were from check book # 7628. This book had been issued in 1958 at the request of Gaston Faraudo while he was secretary of plaintiff and six of the checks from the book in blank and unsigned had been kept in the office of Farca, S. A. The other seven forged checks were from book # 14607. This book had been ordered from defendant by Echeverria. Silverthorne had complained to members of the bank about the issuance of a check book to Echeverria but he had received check book # 12247 from Echeverria. Echeverria ordered and received three check books of 25 checks each, # 12247 in September, 1963; # 14607, October 23, 1963, and # 15697, February 21, 1964, and Silverthorne wrote checks from # 12247 and # 15697.

16. Silverthorne had seen Carlos Echeverria gambling and had remarked to Dick Warren Kuehl, Assistant Manager of defendant in Panama, when talking about the forged checks during March, 1964, that from the time he took over the Aguaceros business he had some doubts about Echeverria and that he had seen him gambling in September or October of 1963, and although Echeverria was winning, Silverthorne wondered "if he was using my money". Further, Silverthorne wrote a letter from Caracas requesting the bank to honor a check for

$200.00 and another for $900.00 to Farcasa, issued March 18, 1964, and in that letter the defendant was advised not to honor any more checks "until further instructions". This letter was written because of Silverthorne's suspicions of Echeverria.

17. All statements of account sent to the plaintiff contain the following statement:

"If within 10 days from date no error or omission is reported, this statement will be considered as definitely approved, and the balance accepted as correct."

18. The plaintiff received all of the original statements sent to it by the defendants corresponding to the period between January 1, 1963 and December 14, 1965 (date of stipulation between counsel), but it made no protests as to the correctness of the account in any of the statements received by it prior to the 20th of March, 1964. The date of the receipt of the statement for the month of February, which was due about the first of March, is not established; therefore, it is presumed to have been received more than ten days prior to March 20th. This presumption is supported by the failure on the part of the plaintiff to present proof or argument to the contrary.

19. The defendant regularly mailed the monthly statements and cancelled checks to the plaintiff at the agreed address, and it was never notified by the plaintiff or anyone on its behalf of the non-receipt of any monthly statement or checks. It was never notified of any error until the verbal notice of the forgeries by J. M. Silverthorne on March 19, 1964, followed by the letter of March 20, 1964 listing the checks and reiterating the claim that the nine checks were forged.

20. Defendant's manager of the Exposicion Branch, Mr. Rafael Paz, was thoroughly familiar with the relationship between plaintiff and Farcasa as there are several companies in Panama that handle "foreign accounts". The law of Panama requires that there be a resident agent and Mr. Paz and other members of the bank knew that Mr. Silverthorne and the others in the plaintiff corporation were non resident and they knew that the bank statements and checks were being sent to Echeverria to be checked by him.

21. The defendant has a policy whereby all checks for over $5,000.00 were sent to the manager for review to determine "the endorsement on the check and in whose favor and why the amount is being so large". This policy was in effect during the time of the forgeries, so five of the checks must have been reviewed by Mr. Paz.

CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of the action.

2. The events in this case occurred in the country of Panama; therefore, the rights and duties of the parties toward each other are governed by the laws of that country. Counsel for both parties agree with the court on this principle of law.

3. In accordance with Rule 44.1, Federal Rules of Civil Procedure, the laws of Panama as stipulated by the parties are rulings of law and are as follows:

Article 989 of the Panama
Commercial Code:

"Article 989.—Banks are required to furnish their customers their accounts current at least eight days after the end of each quarter or liquidation period agreed upon, requesting their written conformity thereof, and the latter, or any comments that may be in order with respect thereto, must be presented within five days.

"Should a customer fail to reply within said period, his account will be held as admitted and the debit or credit balance shall be definitive as of the date of such account."

Article 23 of the Negotiable Instruments Law of Panama:

"Article 23.—When a signature is forged or made without the authority of the person whose signature it pur-

ports to be, it is wholly inoperative, and no right to retain the instrument, or give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

### Article 9 of the Civil Code of Panama:

"When the meaning of the law is clear, its literal content shall not be disregarded under pretext of questioning its true spirit or intention. However, for the purpose of interpreting any obscure expression of law it is permissible to have recourse to the intention or spirit clearly manifested in the law itself or in the trustworthy history of its institution."

4. There are no reported decisions in the Republic of Panama establishing precedents nor construing either Article 989 of the Panama Commercial Code or Article 23 of the Negotiable Instruments Law of Panama. The Negotiable Instruments Law of Panama is a replica of the Uniform Negotiable Instruments Law in the United States. Article 23 of the Negotiable Instruments Law of Panama is the same as 4 Canal Zone Code § 4323. 76A Stat. 242.

5. Article 989 is ambiguous and needs interpretation for its exact meaning cannot be determined from its language. No one can say by reading the act alone just what is meant by "furnish their customers their accounts current at least eight days after the end of each quarter". Does this mean that the bank must wait "at least" eight days before it can furnish the account or does it mean that the account must be furnished to the customer within a period of not less than eight days? Does "furnish their customers" mean that a mailing to the customer is sufficient or does it mean that there must be an actual receipt of the account current by the customer before it can be considered furnished? Then when does the "five days" mention-

ed begin—five days after mailing or five days after receipt of the account, or possibly five days after the eight days?

6. The experts are divided on the effect that is given in Panama to the provisions of Article 989 but it seems that the proper interpretation is that it is not peremptory and establishes only a prima facie situation which is subject to rebuttal. The eminent Dr. Ricardo J. Alfaro, former member of the World Court and a man of more than 50 years of experience in the practice of law which involved a close relationship with banking and mercantile law, in testifying for the defendant that he thought the terms were peremptory, nevertheless admitted that proof could be introduced to establish that there had been no receipt of the balance sheet by the depositor. Dr. Erasmo de la Guardia, former member of the Supreme Court of Panama and author of a treatise entitled "Law of Negotiable Instruments", was of the opinion that the effect of the statute is "to place the depositor in a state of alert" and "it does have the effect also of placing the depositor at a disadvantage in the sense that he has the burden of proving afterward, if he makes a claim, that there was error or fraud or duress".

7. Dr. de la Guardia testified that the law of Panama is that, in order for a depositor to be precluded from recovery from the bank under Article 23 of the Negotiable Instruments Law of Panama where a check has been forged against his account, there must be negligence on the part of the depositor and as this rule of law is general in the United States, it is held to be the law in this case.

8. In the absence of decisions interpreting the laws of Panama, this court will turn to the decisions of the federal and state courts of the United States. Boyd v. Panama Canal Co., D.C. 160 F. Supp. 50; Blas v. Talabera, 9 Cir., 318 F.2d 617 (1962).

9. The resolution containing the deposit agreement between plaintiff and defendant and signed by plaintiff on May 23, 1958, contained no agreement as to reporting errors in plaintiff's account.

In the absence of proof that plaintiff was actually aware of the ten day time limitation for reporting error in the account printed on each bank statement, it is charged merely with the legal duty of examining documentary evidence of the status of its account forwarded to it by the bank within a reasonable time and to report without delay any discrepancies revealed upon comparison with its own records. 8 Cal.Jur.2d Sec. 76, 101; Basch v. Bank of America, etc., 22 Cal.2d 316, 139 P.2d 1 (1943); Frankini v. Bank of America, etc., 86 P.2d 686 (California 1939); Brunswick Corp. v. Northwestern Nat. Bank, etc., 214 Minn. 370, 8 N.W.2d 333; Lewis v. Merchants' & Planters' Bank, 179 Ark. 352, 15 S.W.2d 977.

 10. Failure on the part of the depositor to promptly notify the bank of a discovered forgery is such negligence as will estop the depositor from recovery. What constitutes such a failure of promptness that would "preclude" the depositor under Article 23 and then make him negligent is perforce a question of fact and no arbitrary length of time can be set. Leather Manufacturers' Nat. Bank v. Morgan, 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811; Johnson v. First National Bank of Beaver Falls, 367 Pa. 459, 81 A.2d 95. Silverthorne never faltered but gave the defendant immediate notice upon discovery. He viewed the photographic reproductions of the checks on March 19th and immediately complained that the nine checks in question were forgeries, so plaintiff was not negligent after discovery.

 11. A depositor is under a duty to examine statements furnished periodically by his bank with his cancelled checks and he must reasonably report any errors, including forgeries, to the bank, but this duty may be delegated. Where the depositor's agent, although he himself is the forger, has been assigned the duty of verifying statements against the depositor's books of account, the knowledge of forgeries that the agent possessed, from the fact that he himself was the forger, is in no respect attributed to the depositor, but the depositor is charge-

able with such information as a comparison of the checks with the check book would have imparted to an innocent party previously unaware of the forgeries. In re Parry Lines, Inc., D.C., 150 F.Supp. 693; Huber Glass Co. v. First National Bank of Kenosha, 29 Wis.2d 106, 138 N.W.2d 157 (1965); 9 C.J.S. § 356, par. c(2); Fletcher American Nat. Bank v. Crescent Paper Co., 193 Ind. 329, 139 N.E. 664; 67 A.L.R. 1124; Deer Island Fish, etc. v. First Nat. Bank, 166 Miss. 162, 146 So. 116 (1933).

 12. The plaintiff was not estopped nor precluded because its local agent had received the monthly statements and checks, nor was it negligent in not auditing or checking the account between Silverthorne's visits in October and March. Defendant was thoroughly cognizant of the custom of local representatives, the law of Panama requiring them, and the arrangement between plaintiff and Farca, S. A. For years plaintiff had entrusted its local representation to Farca, S. A. and even though Silverthorne, the company treasurer, had expressed that he felt suspicious of Echeverria and wondered about him when he saw him gambling, he had no reason to suspect him of forgery. The statements made to Kuehl by Silverthorne were in retrospect after the forgery and were the natural reaction of a man who has been cheated. The account was in order when he last saw it in October, 1963 and he had no chance to review it until his return on March 19th when he immediately did everything possible to notify the defendant and help it to learn the identity of the forger to the point of eliciting a confession from him and advising the defendant of it. He even went to their New York office to confer about it. Worthen Bank and Trust Co. v. Kelley-Nelson, etc., 219 Ark. 882, 245 S.W.2d 405.

 13. The defendant bank was negligent in honoring the series of forged instruments even though the forgeries were excellent. Such an unusual flow of large checks payable to cash and endorsed by Echeverria; payable to bearer and endorsed by his secretary; and payable to a

company wholly owned by Echeverria was most unusual in an account such as that of plaintiff where for months on end no activity in the account was had except the regular deposit of the $7,500.00. Mr. Paz knew that Silverthorne and Sanchez were non resident and such a flood of large checks in round numbers suddenly being drawn from the account for the benefit of the local representative alone, who had no authority to sign checks but was merely serving in compliance with a statutory requirement, should have put the bank on inquiry. The intimate and delicate relationship between a bank and its depositors necessarily charges the institution with more care than was displayed here. Any adequate inquiry on its part would have prevented reptition of the forgery. Defendant was receiving the monthly deposits from Honduras; Mr. Paz knew that Silverthorne lived in Honduras; if his exact address was not known by defendant, it could have been obtained from Echeverria who maintained his office in the same building with defendant's "Exposicion" Branch or by contacting the correspondent bank in Honduras, Banco Atlantida de Honduras. The sum of $44,000.00 was paid in checks that at times exceeded the $5,000.00 size that necessarily passed through the bank manager for rechecking and a determination as to why certain large funds were going in certain directions. Surely this strange activity on the part of the account should have caused investigation and this is especially true when the first two checks falsely uttered were of a size to require them to be submitted to the manager's inspection. Jackson v. First National Bank of Memphis, Tenn.App., 403 S.W.2d 109 (May 16, 1966); First National Bank of McAlester v. Mann, 410 P.2d 74 (Supreme Court Okl. 1966); First Nat. Bank of Weslaco v. Patty, 62 S.W.2d 629 (Tex.Civ.App.1933); Union Wholesale Co. v. Bank of Delaware, 190 A.2d 761 (Delaware 1963); Clarke v. Camden Trust Co., 84 N.J.Super. 304, 201 A.2d 762 (New Jersey, 1964).

14. "A bank is under an obligation to its depositor to use care in scrutinizing checks paid in order to detect forgeries and to render its accounts to prevent the perpetration of frauds upon its depositor. Therefore, if a bank, in the exercise of proper care, could have discovered the alteration or forgery of a customer's checks, it cannot throw the loss caused by paying them upon the depositor merely because he failed to examine his account." 7 Am.Jur. 516, p. 371; Basch v. Bank of America, etc., 22 Cal.2d 316, 139 P.2d 1 (1943).

15. A depositor's negligence in failing to examine his monthly statements and canceled checks constitutes no defense if the bank was negligent. As between a bank and its depositor, payment of forged checks by it is made at its peril and cannot be charged against a depositor's account unless some negligent act or conduct of the depositor has contributed to induce such payment, the bank itself being free from negligence, or unless by his conduct the depositor is estopped to deny the correctness of such payments. Basch v. Bank of America, etc., 129 P.2d 742, 749 (California 1942); Sommer et al. v. Bank of Italy, etc., 109 Cal.App. 370, 293 P. 98 (1930); Airco Supply Co. v. Albuquerque National Bank, 68 N.M. 195, 360 P.2d 386 (1961); 7 Am.Jur. § 516; Coleman Drilling Co. v. First Nat. Bank, etc., 252 S.W. 215 (Tex.Civ.App.1923); R. H. Kimball, Inc. v. Rhode Island Hospital Nat. Bank, 72 R.I. 144, 48 A.2d 420.

16. The plaintiff shall recover of the defendant the sum of $44,000.00, which is the amount deducted from its account by reason of the forgeries, plus interest from March 20, 1964 at the rate of six per cent per annum until paid, and its costs herein expended, and the Clerk of the Court shall prepare and enter a judgment in accordance with these conclusions. (4 C.Z.C. § 4651)