**In the Matter of PARRY LINES, Inc., Bankrupt.**

United States District Court
S. D. New York.
April 17, 1957.

694

Charles Seligson, New York City, for John Dunaif, Individually and as Trustee of Parry Lines, Inc., Bankrupt, Melvin Lloyd Robbins, New York City, of counsel.

Maurice, McNamee & White, New York City, for Atlantic Bank of New York, Stewart Maurice, Robert Brooks White, New York City, of counsel.

SUGARMAN, District Judge.

John Dunaif, trustee for the above-named bankrupt (hereinafter referred to as the petitioner), moves "for an order" against the Atlantic Bank of New York (hereinafter referred to as the respondent) "directing the said Atlantic Bank of New York to restore to the account of your petitioner in the said bank the sum of $24,631.50, or if the said bank shall fail to restore the said sum, for an order directing the Federal Reserve Bank to sell sufficient securities now on deposit with the said Federal Reserve Bank for the purpose of restoring the sum of $24,631.50 to your petitioner's account and to deposit to the credit of the petitioner's account out of the proceeds of said sale the sum of $24,631.50; and for such other and further relief as to this Court may seem just and proper."

The facts, as admitted by the respondent in its answer to the petition and as developed by testimony at hearings ordered herein and held on November 23, December 5 and December 14, 1956, which gave rise to the petition, are found to be as follows:

On September 26, 1949, Bank of Athens Trust Company (hereinafter referred to as Athens) was appointed a depository by this court for moneys of estates under the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. Athens was represented on its application for appointment as such depository by the law firm of Reich, Peller & Devaney, of which firm A. Alan Reich was a partner. At that time and for the succeeding seven years Reich, Peller & Devaney, or a successor firm of which Reich was a partner, represented Athens and respondent in litigation for the collection of past due obligations due Athens and the respondent.

On December 30, 1949, Parry Lines, Inc., a corporation engaged in the business of shipping, was adjudged a bankrupt upon its voluntary petition. On January 24, 1950, petitioner was appointed trustee for the bankrupt and A. Alan Reich was appointed attorney for the trustee. Petitioner is a member of the New York Bar of 30 years standing. Except for one small estate his appointment in the instant bankruptcy was his only experience of that nature.

As such trustee, on February 10, 1950, petitioner opened an account with Athens in the name of the bankrupt by an initial deposit of $42,428.62. Petitioner had been referred to Athens by Reich, the latter being at that time either trustee or attorney for the trustee in other bankrupt estates whose accounts were maintained with Athens. The mechanics of opening the account were either that petitioner accompanied Reich or one of Reich's associates to the bank, or the signature cards were presented to petitioner by Reich or one of his associates elsewhere. In either event, petitioner executed two signature cards. Upon the back of each there was printed, among other things:

> "Depositor's Contract * * * the statement of account and cancelled vouchers shall be mailed to depositor monthly; that depositor will examine the monthly statement and returned vouchers accompanying same promptly and notify the Bank at once of any error in the account or of objection for any reason to any returned voucher being charged

against the depositor; that unless the depositor shall notify the Bank in writing within fifteen days of the delivery or mailing of any statement and cancelled vouchers of any claimed errors in such statement, or that depositor's signature upon any such returned vouchers was forged, or that any such voucher was made or drawn without depositor's authority, or that it was raised or otherwise altered, or unless the depositor shall have notified the Bank in writing within three months after the delivery or mailing of such vouchers that any endorsement thereon was forged or made without authority of the endorser, the statement of account shall for all purposes be considered correct and the Bank shall not be liable for any payments made and charged to the account or for any other errors in the statement of account as rendered to depositor; that no legal proceeding or action shall be brought by the depositor to recover payment of any instrument upon which any signature or endorsement has been forged or which was drawn, made, accepted or endorsed without the authority of the depositor or the endorser, or which was raised or altered, unless the depositor shall have given written notice to the Bank as provided in the preceding clause and unless the same shall be commenced within one year of the date when such statement and cancelled vouchers were delivered or mailed to the depositor; * * *"

Petitioner did not write upon or see the back of the signature cards and did not read the "Depositor's Contract."

At the time the account was opened, Athens supplied petitioner with a book of printed blank checks in form substantially in compliance with Rule 34 of the General Bankruptcy Rules of this court then in force.* Each check blank in said book, in addition, had imprinted thereon "PD 20," which was the bank's legend

that the account was a "public deposit," i. e., a trust account. The petitioner at all times herein involved kept the checkbook of the bankrupt in his office.

On March 6, 1950, an increase of the bond of Athens to the sum of $500,000 as a depository was approved by this court.

On much testimony addressed to whether Athens and respondent sent out a statement of the bankrupt's account at the close of business each month I am satisfied that they did so. However, the statements to the close of business on April 30, 1953, were all sent to the petitioner, whereas those for subsequent months were all sent to Reich. On May 20, 1953, without the petitioner's knowledge or consent, Reich instructed Athens to send the bankrupt's statements and cancelled checks to him at the business address of his law firm. Some months later the petitioner learned of this change when, in the process of preparing a trustee's interim report, he noticed that the then recent statements were not in his possession. He spoke to Reich or one of his associates and was informed that Reich had undertaken to change the mailing address in order to expedite the preparation of trustee's interim reports. The petitioner never countermanded Reich's instructions to the bank after he learned of it.

On November 20, 1953, Athens and another bank having been merged into the respondent Atlantic Bank of New York, an order was entered in this court providing that the designation of Athens be "continued in full force and effect, and deemed to be the order of designation of Atlantic Bank of New York as a depository for the money of estates under the Bankruptcy Act" and "that the bond heretofore filed herein by Bank of Athens Trust Company * * * be and the same hereby is continued in full force and effect, and deemed to be the bond of and filed by Atlantic Bank of New York * * *"

In January of 1955, Reich had a conversation with one Eugene W. Flister, an

---

* Present Rule 8(b) of the Bankruptcy Rules of this court adopted March 1, 1952.

Assistant Treasurer of respondent. Flister was in charge of the small and installment loans department of respondent. In that conversation Reich suggested to Flister that the latter subscribe to stock in Concord Supplies & Equipment Corp. (hereinafter referred to as Concord), a company in which Reich was interested. Reich indicated to Flister that the company was seeking a listing on one of the exchanges and needed 1,000 subscribers to its stock. Flister was the only one at the respondent bank to whom Reich made this proposal. Without discussing it with any other person at the respondent bank, without asking Reich any questions about Concord, without ascertaining where it did business, what its business was, what assets it had, or how much it expected to raise by the sale of the stock, Flister agreed to subscribe for 200 shares of its stock.

Shortly thereafter Flister received a questionnaire from a brokerage house, which he answered, signifying his interest in purchasing the Concord stock when it became available.

On March 1, 1955, the respondent was continued as a depository for bankruptcy funds of this court upon its simultaneously giving a renewed bond in the sum of $500,000. In each instance, in lieu of sureties on the bond, Athens and respondent deposited United States securities with the Federal Reserve Bank. Thus, in the bond of respondent, filed March 1, 1955, the bank bound itself to

"well and truly account for and pay over all moneys deposited with it as such depository, and [to] * * * pay out such moneys only as provided by the Bankruptcy Act and applicable general orders and court rules, and [to] * * * abide by all orders of the said Court in respect of such moneys, * * * and [to] * * * otherwise faithfully perform all duties pertaining to it as such depository * * *"

Thus also, the bond recites that, in lieu of a surety the respondent deposited with the Federal Reserve Bank of New York "subject to the orders of the several Judges of the said Court, bonds and notes of the United States of the par value of Five Hundred Thousand Dollars ($500,000.), to be held as security for the faithful performance of the conditions of this undertaking. It is agreed that the said Court, upon order, may collect or sell such bonds or notes of the United States in case of any default in the performance of any of the conditions or stipulations of the within bond."

In March of 1955, Flister received a telephone call from the brokerage house that his 200 shares of Concord stock "was coming through." This call was followed by a bill for $200 from the brokerage house, which Flister received by mail. Although Flister had maintained a checking account for 17 years at one or another bank, he did not pay for the Concord stock by check. I cannot believe Flister's story that he went to his safe deposit box in the respondent's bank and withdrew therefrom $200 in cash which he had saved out of his salary and sent this $200 in cash to Reich for Reich to transmit it to the brokerage house. Although this was the only stock that Flister had ever acquired, the claimed method of payment is incredible and the inference is inescapable that Flister never paid for the 200 shares of Concord stock although a month later he received a stock certificate therefor from the broker.

On August 12, 1955, Reich requested of Flister that the respondent loan Reich $7,500 for "personal use" for one month. By agreement with Flister, Reich deposited with respondent as collateral 15,000 shares of Concord stock, valued at $1 per share. Reich negotiated this loan with Flister, who subsequently procured the approval on Reich's application of another officer of the bank. Flister requested no financial statement from Reich but did ascertain through the credit interchange that there were no judgments against Reich.

From the inception of the bankrupt's account with the respondent on February

10, 1950 through August 31, 1955, a total of $63,258.01 was deposited and a total of $10,152.66 was withdrawn. Thus, there is no dispute that the balance of $53,105.35 reflected on the respondent's books on August 31, 1955 was correct.

On September 7, 1955, Reich came to the bank and presented to Flister a check ostensibly issued by the bankrupt. This check was not numbered, as required by the rule, supra, and was not written on one of the blanks originally furnished the petitioner by Athens. It was typed on a blank of respondent. The legend "PD 20" was typewritten on the check. The check, in the sum of $27,150, was dated September 2, 1955, and was made payable to "A. Alan Reich attorney." It bore what purported to be the signature of the petitioner and the counter-signature of the referee. The referee's purported signature appeared on a rubber-stamped imprint on the face of the check. In a box at the left side of the face of the check there was typed "For: settlement of lien asserted by Asiatic Petroleum as per stip entered into on Aug. 25, 1955." The petitioner never signed that check. Asiatic Petroleum never asserted any claim against the bankrupt. Reich was not entitled to any sum from the bankrupt's estate at that time. The referee's counter-signature was also a forgery. The spurious check of September 2, 1955, was endorsed by A. Alan Reich. Flister initialed it and then, at Reich's request, issued a bank check in the sum of $27,150 to Reich which was subsequently deposited to the account of Concord in another bank. In the light of the Flister-Reich relationship I disbelieve Flister's claim that he went to the third floor of the respondent and compared the signatures of the petitioner and referee on the spurious check of September 2 with those on file in respondent's records.

It should be parenthetically noted that the petitioner's claim herein does not include this $27,150, because the respondent restored that sum to the account of the bankrupt on May 29, 1956.

Because the bank statements and cancelled checks were then being sent to Reich, the petitioner did not learn of the debit against the estate account of this and later forged checks until March of 1956, and accordingly did not notify the bank thereof in any instance except the last check of February 20, 1956, infra, within the 15 days of the mailing of the last statement, required by the "depositor's contract" on the back of the signature cards signed by the petitioner when he opened the account in February 1950.

On September 12, 1955, Reich's $7,500 one month loan by respondent came due. It was satisfied by a refinanced loan by the respondent to Reich, made on September 15, 1955, in like amount, for a period of one month. The 15,000 shares of Concord stock remained with the respondent as collateral. Flister not only approved the new loan and procured the approval of another officer of the bank thereto but also signed Reich's name to the application for the renewal. The note came due on October 15, 1955 and remained unpaid until November 14, 1955.

In the meantime and on November 9, 1955, there was charged against the account of the bankrupt a further sum of $9,281.50. This debit arose through a check ostensibly drawn on the bankrupt's account on November 4, 1955, and deposited on November 7, 1955, to the account of Concord in another bank and which came to the respondent through the clearing house. Here again the form of check used was not that originally issued by Athens to the petitioner. A blank of respondent was again employed. Here again the signatures of the petitioner and the referee were forgeries. However, in this case, in addition to the typewritten legend "PD 20" a check number 29 had been typed on this check. In a box at the left side of the face thereof were the words "Fee 9000 disbursements 281.50." Flister had nothing to do with this check of November 4, 1955. After the check was paid the purported signatures of the petitioner and referee thereon were compared in the ordinary course by a comparison clerk who impressed her identifying stamp thereon in the bookkeeping de-

partment. There were not due any fee or disbursements to Reich at that time.

As aforesaid, Reich's loan due October 15, 1955 was again refinanced by a similar loan on November 14, 1955. The application therefor had been made on November 10, 1955, where Flister again signed Reich's name to the application and this time also filled out the questionnaire on the back thereof. Flister then procured the approval of the president of the bank to this application. The note was to become due on December 14, 1955.

On November 15, 1955, another check was charged to the bankrupt's account for $14,000. Here, too, the blank used was not one supplied to the petitioner by Athens but was a blank of respondent. It was dated November 10, 1955, was unnumbered and was made payable to "A. Alan Reich, Attorney." It was typed, except for the imprint of the countersignature stamp and the forged signatures of the petitioner and the referee. In the box at the left side of the face of the check there appeared: "For: Settlement Pursuant to Stipulation of Libel and in Release of the Trustee." It was endorsed by Reich for deposit to the account of Concord in another bank and reached the respondent bank through the clearing house. The purported signatures of the petitioner and referee on this spurious check were not compared with the signatures on file with the respondent because, through error, this check was placed at the wrong ledger and was not transferred to the proper ledger in the bookkeeping department of the respondent until after the comparison clerk had completed her comparison of signatures on that day's checks. On November 10, 1955, the date of this check, there was no controversy pending involving a libel recited as having been settled.

The November 14, 1955 note from Reich to respondent having come due on December 14, 1955 it was defaulted and remained unpaid until January 9, 1956, when it was refinanced by a new loan in like amount. In this instance, Reich signed the application which Flister approved and to which the latter procured the approval of the president of the bank. This note came due on February 9, 1956. It was not paid on the due date but was refinanced on February 29, 1956.

In the meantime and on February 20, 1956, another check was drawn on the bankrupt's account, this time for $1,350. Here again the check was typed on a blank of respondent and made payable to "A. Alan Reich." In the box at the left side of the face of the check there appeared: "For: Fee Attorney for Trustee." Neither the petitioner nor the referee signed this check. Reich was not entitled to any fee for services to the estate on that day. This check bore the typed legend "PD 20" and also a check number 26. It was cashed over the respondent's counter on February 24, 1956. Although the purported signatures of the petitioner and the referee appearing on the check were compared by a comparison clerk with those on file at the respondent, it cannot be ascertained whether this comparison was made before or after the check was cashed.

When Reich's note of January 9, 1956 came due on February 9, 1956 and remained unpaid for five days, respondent wrote him on February 14 that his request for refinancing thereof would be granted only if he reduced the principal by $1,000. Accordingly, on February 29, 1956, Reich submitted a new application for a one month loan, which he signed and which Flister approved, and to which Flister procured the approval of the president of the bank. This refinancing, however, was in the sum of $6,500. Reich delivered to respondent two checks of Concord, drawn to his order and endorsed by him, aggregating $1,018.05, representing the $1,000 reduction in the principal of his outstanding loan and interest. Both of these checks were returned by the bank upon which they were drawn, marked "Not Sufficient Funds." The total amount of Reich's last note and these checks remains unpaid to date.

In all of the negotiations between Reich and Flister, represented by the original loan and the refinancing or renewals thereof, except for ascertaining through

the credit interchange on occasions whether there were any judgments against Reich and except for ascertaining on occasions the over-the-counter value of the 15,000 shares of Concord stock pledged as collateral, Flister never attempted to learn by financial statement or inquiry of Reich's partners, Reich's true financial condition. The loan was granted and renewed solely on Reich's answers to the questionnaire on the original loan application, which were copied therefrom on successor applications by either Flister or someone in his department.

On March 2, 1956, the petitioner first learned that the bankrupt's account with respondent, instead of reflecting the balance of $53,105.35, as it was at the close of business on August 31, 1955, had been depleted by the sum of $51,781.50, represented by the four forged checks ($27,-150, $9,281.50, $14,000 and $1,350) and showed a balance as of February 28, 1956, of $1,323.85. He thereupon visited the respondent, ascertained the facts and made demand that the $51,781.50 be restored. As aforesaid, $27,150 thereof represented by the first spurious check was made good by the respondent. It refused to make good the balance and the petitioner brought this proceeding.

The petitioner seeks a recovery herein against the respondent by pleading as to each check for which reimbursement has been refused by respondent, three theories of recovery, viz., a) contract (causes of action 1st, 4th and 7th) ; b) tort (negligence) (causes of action 2nd, 5th and 8th) ; c) tort (fraudulent conversion, requiring the respondent to account as a trustee ex maleficio) (causes of action 3rd, 6th and 9th).

For a complete defense to all causes of action the respondent pleads "estoppel" by reason of petitioner's failure to notify respondent of the alleged forgeries within the 15 days as expressed in the "Depositor's Contract" on the signature cards or, as implied in law, within a reasonable time. As defenses to the 1st through 6th causes of action (those dealing with the checks in suit except the last one of February 20, 1956), the respondent also pleads "accounts stated."

By way of counterclaim, the respondent claims that it has been damaged by the negligence of petitioner in the amount (if any) for which petitioner may recover judgment against respondent. Respondent then prays that the petition herein be dismissed, with costs or, if it be adjudged that the respondent is liable to petitioner for some or all of the items involved, that respondent have judgment against petitioner, individually and/or as trustee herein, for a like amount, with costs.

There is no evidence in the case tending to sustain the claims of fraudulent conversion requiring respondent to account as a trustee ex maleficio, pleaded in the 3rd, 6th and 9th causes of action.

The 2nd, 5th and 8th causes of action in negligence are merely variant, although more explicit, and thus superfluous expositions of the theories pleaded in the 1st, 4th and 7th causes of action in contract because " * * * the contractual relationship occupies fully the rights and responsibilities of the parties to the account." [1]

Accordingly, the respondent's motion to dismiss the 2nd, 3rd, 5th, 6th, 8th and 9th causes of action is granted.

Similarly, the respondent's contentions, denominated a counterclaim, do not state an independent claim against the petitioner but are matters of defense, properly set forth in the pleading with its other defenses, Fed.Rules Civ.Proc. rule 8(c), 28 U.S.C.A., and are considered solely as such.

Stripping the pleadings of the superfluous 2nd, 5th and 8th causes of action and counterclaim is best explained by

1. Stella Flour & Feed Corp. v. National City Bank, 1st Dept. 1954, 285 App. Div. 182, 187, 136 N.Y.S.2d 139, 145; Syracuse Law Review, 6:365; St. John's Law Review, 29:291.

paraphrasing what was said in a similar situation

"The petitioner sues for a debt to which the respondent answers: We have paid the money, true not according to your directions, but in compliance with what we believed to be your directions, and your negligent conduct in your duty towards us led us into that error. To which the petitioner rejoins: Your own negligence contributed to the loss. All this may be true, yet the petitioner recovers not in tort but on contract, for the allegation of negligence on the part of the respondent is used only to defeat its claim for relief on account of the petitioner's negligence." [2]

Therefore, the first issue resolves to this: Did the respondent pay out estate funds not in accordance with the petitioner's directions, but in compliance with what it believed to be his directions, i. e., on forged checks? If so, the respondent is prima facie liable to restore the funds by crediting the petitioner's account in the amount of the forgeries.

However, where there is evidence of negligence, actual or imputed, on the petitioner's part, a second issue is presented: Was the respondent's error in honoring such forged checks induced by the petitioner's negligent conduct in his duty toward the respondent? If so, the respondent is relieved of responsibility for the loss, because it was "damaged" by petitioner's negligence, unless the trier of the facts affirmatively answers a third issue: Was the respondent free on its own part in performance of the contract, of negligence contributing to the loss? A finding of such negligence on the part of the respondent defeats any possibility of the respondent relieving itself of its contractual liability by way of defense or counterclaim.

Considering the first issue, it is conceded by both parties to the instant proceeding that the checks here involved were forged by A. Alan Reich. Good faith payment by the respondent to Reich of the funds was proven on the hearings.

■ Considering the second issue, regardless of personal fault or the absence thereof in the discharge of his duties to respondent, the petitioner must be charged vicariously with any negligence on the part of Reich whose instructions to send Reich and not petitioner the statements and cancelled checks were never countermanded by the petitioner. A depositor is under a duty of examining the statements furnished periodically by his bank with his cancelled checks and he must seasonably report any errors, including forgeries, to the bank. This duty may be delegated. Where the depositor's agent, although he himself is the forger, has been assigned the duty of verifying the statements against the depositor's books of account

"the knowledge of the forgeries that [the agent] possessed, from the fact that he himself was the forger, was in no respect to be attributed to the [depositor]. But we see no reason why [the depositor was] not chargeable with such information as a comparison of the checks with the check book would have imparted to an innocent party previously unaware of the forgeries. The [depositor's] position may be no worse because [he] intrusted the examination to [the forger] instead of to a third person; but [he] can be no better off on that account. If [he] would have been chargeable with the negligence or failure of another clerk in the verification of the accounts [he] must be equally so for the default of [the forger] so far as the examination itself would have disclosed the facts." [3]

2. Critten v. Chemical National Bank, 1902, 171 N.Y. 219, 220, 232, 63 N.E. 969, 974, 57 L.R.A. 529.
3. Critten v. Chemical National Bank, supra, 171 N.Y. at page 230, 63 N.E. at page 973; see Leather Manufacturers' Nat. Bank v. Morgan, 1886, 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811.

It is beyond doubt that had the petitioner possessed the knowledge that would have been imparted to him by an inspection of the monthly statements and cancelled checks returned by the respondent to Reich after the first forgery, none of the subsequent forged instruments here in suit could have been collected by Reich.

■ The petitioner did not have that knowledge but he is charged with it and his failure to act thereon by alerting the respondent to Reich's activities was negligence imputed to him for the purpose of determining the respondent's liability.

■ That brings us to the third issue: the respondent's contributing negligence. The respondent was guilty of negligence in dealing with the account here involved and this negligence dictates that petitioner prevail.

■ The contract of deposit included not only the "Depositor's Contract" on the signature cards but also the General Orders in Bankruptcy, 11 U.S.C.A. following section 53, and the local rules of this court.[4] The respondent undertook thereby to exercise due care in the fulfillment of its contractual obligations to the petitioner. In this duty it has failed.

In determining that the respondent was negligent, it is unnecessary to charge it with a familiarity with any esoteric legal concepts. However, as a designated depository, the respondent was on notice of the relatively simple but clear and explicit mandate of the local bankruptcy rule which prescribes the form of drafts required to be used by trustees in bankruptcy. Two of the forgeries were not numbered as required by the rule. None was drawn on the check blank which the respondent's predecessor Athens had furnished to the petitioner. The petitioner had used the furnished special check forms exclusively in drawing on the estate funds. Reich used regular check blanks of the respondent with typed or stamped impressions thereon to simulate proper forms of draft on the trustee's account.

Considering that two of the forged checks were not numbered; that none of them was made up on the printed forms furnished the petitioner; that they were all payable to A. Alan Reich whom respondent knew to be the attorney for the trustee; that the forged checks were in relatively substantial amounts and that three of them were paid to Reich when to respondent's knowledge Reich was defaulting on loans made to him for "personal use" by respondent, the conclusion is compelled that respondent failed to exercise reasonable care in safeguarding these trust funds and therefore was negligent in discharging its duty to the petitioner.[5]

It was respondent's officer Flister's failure to act in a reasonably prudent manner under all the circumstances when Reich walked into its establishment on September 7, 1955 that set in motion the chain of events resulting in the depletion of the estate account. Whether it was the Concord stock incident of six months earlier or just a cavalier attitude because Reich was one of the respondent's attorneys that persuaded Flister to utterly ignore simple caution as a banker is unimportant. What is important is that he initialed and approved a check drawn on a "PD20" trust account without (despite his testimony to the contrary) checking the signatures. He made no inquiry as to why the printed form supplied the petitioner by Athens was not used; why the provision for the referee's signature was rubber-stamped; why the check was not numbered; why (although it purported to settle a lien asserted by Asiatic Petroleum against the bankrupt estate) the check was payable to Reich as attorney when he knew Reich was the petitioner's

4. Maryland Casualty Co. v. Central Trust Company, 1948, 297 N.Y. 294, 79 N.E. 2d 253.

5. Compare Gutfreund v. East River Nat. Bank, 1929, 251 N.Y. 58, 65, 167 N.E. 171, 64 A.L.R. 1103; Land Mark Corporation v. Manufacturers' Trust Co., 2nd Dept.1933, 238 App.Div. 844, 262 N.Y.S. 709.

counsel. Further, although he knew that less than a month before Reich for "personal use" had borrowed $7,500 from respondent through Flister, he arranged for Reich to get in exchange for the forged check an official bank check in like amount of $27,150 made out to Reich. Although failure to verify the signatures was not of itself negligence, since the forgeries were excellent, this failure to compare signatures is indicative of the indifferent manner with which the respondent dealt with Reich in regard to this trustee's account. Had Flister acted in a reasonably prudent manner and alerted by the succession of irregularities presented called the petitioner or even questioned Reich about them, that and the ensuing frauds would have been nipped in the bud.

The respondent therefore may not defeat the petitioner's claim on a theory of the petitioner's negligence because its own negligence contributed thereto.

It appears that this finding of respondent's negligence renders it liable without regard to its asserted defenses of 'estoppel' and 'account stated.' [6] As was said in the Leather Manufacturers Bank case, 117 U.S. at page 112, 6 S.Ct. at page 663:

> "Of course if the defendant's officers, before paying the altered checks, could by proper care and skill have detected the forgeries, then it cannot receive a credit for the amount of those checks, even if the depositor omitted all examination of his account."

■ However, other cases seem to indicate that regardless of the respondent's

negligence, petitioner may not recover if he himself was actually, rather than vicariously, negligent.[7] Assuming this to be the rule, I find, from the evidence, no negligence on the petitioner's part which in any way contributed to the loss.

Nothing in the record indicates that John Dunaif exercised less than due care in selecting and dealing with his attorney. It would impose an unduly high standard of care on a client were the law to require him to anticipate that his attorney would perpetrate the bold crimes which Reich did. Dunaif was not negligent in believing Reich's story that he, Reich, had left instructions that the bank statements and cancelled checks be sent to Reich's office solely for convenience in preparing the trustee's reports. Clients are expected to have full trust and confidence in their attorneys.[8] The respondent's defense of 'estoppel' by negligence was therefore not proven against the petitioner's claims.

Nor is the respondent's plea of 'account stated' as to the checks of November 4th and November 10th, 1955 good, under the facts disclosed in the instant case.[9]

The motion is granted and Atlantic Bank of New York is directed to restore to the account of Parry Lines, Inc., bankrupt, the sum of $24,631.50 within 15 days from the entry of an order hereon. Should respondent fail so to do petitioner may move for an order that sufficient of respondent's securities on deposit with the Federal Reserve Bank be sold for the purpose of making such restoration.

This decision shall constitute the findings of fact and conclusions of law.

6. See New York Produce Exchange Bank v. Houston, 2 Cir., 1909, 169 F. 785, certiorari denied 1909, 214 U.S. 525, 29 S. Ct. 703, 53 L.Ed. 1067; 25 Temple L. Q. 368; Gutfreund v. East River Nat. Bank, note 5, supra; Restatement of Contracts, New York Annotations, § 422; Leather Manufacturers Bank v. Morgan, note 3, supra.

7. Screenland Magazine v. National City Bank, Sup.Ct.1943, 181 Misc. 454, 42

N.Y.S.2d 286; Restatement of Contracts, note 6, supra.

8. In re Smith's Estate, Surr.1933, 148 Misc. 585, 266 N.Y.S. 666, affirmed 4th Dept.1935, 246 App.Div. 563, 282 N.Y.S. 845; 2 Collier on Bankruptcy, para. 44.23 (14th ed.)

9. Wachsmann v. Columbia Bank, C.C.Gen. Term 1893, 6 Misc. 62, 26 N.Y.S. 885, affirmed Com.Pl.Gen.Term 1894, 8 Misc. 280, 28 N.Y.S. 711.