# R. H. KIMBALL, INC. *vs.* RHODE ISLAND HOSPITAL NATIONAL BANK.

JULY 26, 1946.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J. This action in assumpsit was brought by R. H. Kimball, Inc., a corporation, to recover the amount of certain unauthorized checks, which had been paid by the Rhode Island Hospital National Bank, a corporation, and charged to the plaintiff's account in that bank. A trial in the superior court resulted in a jury's verdict for the plaintiff in the sum of $39,170.42, and the trial justice thereafter denied the defendant's motion for a new trial. The case is here on defendant's exceptions to that decision and to ninety-six other rulings made during the course of the trial.

The plaintiff alleged in its declaration, in substance, that between March, 1938 and August, 1942, inclusive, the sum of $61,646.22 had been improperly charged by the defendant to the plaintiff's account, by reason of the bank's payment of ninety-three unauthorized checks, each drawn to the order of the bank and each having the signature of Gladys H. Kimball forged thereon by the plaintiff's bookkeeper, Arvid S. C. Anderson.

The defendant filed a plea of the general issue and also several special pleas, setting up certain defenses and facts upon which the plaintiff was alleged to be estopped or precluded from any recovery.

The following summary of facts from the extensive transcript is deemed to be sufficient to properly understand the various contentions of the parties: For many years the plaintiff maintained a substantial deposit in defendant's bank. The bank was authorized to pay and to charge to the plaintiff's account only those checks which were signed for the plaintiff by either Howard Kimball, its president and treasurer, or Gladys H. Kimball, its vice-president. Two signature cards, showing such order and also exhibiting the authorized signatures of these officers, were at all times in possession of the bank, one being kept in the teller's cage and the other in the bookkeeping department at the main bank.

Prior to his employment by plaintiff, Anderson, who admittedly forged all the checks, had worked as a register clerk

and otherwise in what later became the defendant's main bank. He therefore was acquainted with some of its tellers and some of them also knew him. He first came to the plaintiff's office as an employee of an accountant who had been engaged by plaintiff to bring some of its books to date. Later he was employed by plaintiff as its bookkeeper and office manager. For many years prior to 1938, he had rendered efficient service to the plaintiff in that capacity and had given it no reason to doubt or suspect his honesty. His duties included the keeping of all records and books of account; making deposits of incoming checks; making out all the plaintiff's checks with the exception of the signatures, which were added by the president and treasurer or the vice-president; making cash withdrawals, on properly signed checks, for payroll and petty cash purposes; receiving from the bank monthly statements and cancelled checks and reconciling them with plaintiff's records and books, subject to monthly supervision by independent accountants. He never had authority to sign plaintiff's checks, and no checks were ever signed in blank by the officers for him to fill in later.

All of the ninety-three frauds involved here were accomplished in the same way, that is, by Anderson's obtaining cash from the bank on withdrawal checks which he had made out on the plaintiff's regular printed checks and which were made payable to the bank; but on each of these checks the name "Gladys H. Kimball" appearing under the printed name, R. H. Kimball, Inc., was forged by Anderson. These checks were all cashed by him at the main bank, although withdrawal checks for payroll and legitimate purposes were usually presented to the defendant's branch, which was located near the plaintiff's business.

The bank had an established system for examining depositors' checks. The tellers were expected to have, from study and experience, a knowledge of the signature of each depositor and were expected to examine each check, when presented, to determine the authenticity of the signature. This was to be done by comparing the signature on each

check with the teller's or clerk's "mental picture" of that depositor's signature. At least five persons, including tellers and clerks in the bookkeeping department, were expected to make similar examinations of all checks of a depositor before actually charging that depositor's account, and any doubtful check was supposed to be brought to the attention of a superior officer in that department. Many doubtful checks of other depositors were thus referred to and passed on by that officer during the period in question, but none of these ninety-three checks was ever questioned by any of the tellers, clerks, or officers of the bank. There was no evidence that any teller, clerk or officer ever used the plaintiff's signature card by which to verify the signature on any of these forged checks; nor is there specific evidence that any of the ninety-three checks was actually and individually inspected according to the bank's system. Apparently the character of the forged signatures and inferentially the tellers' confidence in Anderson entered into the composite mental picture which was used as a standard in passing upon the signatures on the forged checks.

The plaintiff's bookkeeping system called for pads of blank checks, without stubs, which were numbered serially and on which was also printed the name of R. H. Kimball, Inc. Below that was a blank line for the signature of a proper officer. These pads of numbered checks were furnished by the bank. Plaintiff used a loose-leaf cash book as a part of the bookkeeping system that was installed for it by the accountants. This cash book also served the purpose of ordinary check stubs, and therein was listed in numerical order every legitimate check that was drawn. The checks themselves, even if voided for any reason, were all kept and, with the cash book, were examined monthly by a firm of independent accountants. Such checks and cash book conformed to the approved practice followed by the great majority of manufacturers doing business, in nature and extent, like that of the plaintiff.

The method pursued by Anderson to deceive the bank

and to conceal his frauds from the plaintiff and the accountants was complicated. Without intending to explain all the details, the following facts will indicate substantially the general plan: Anderson, when needing money, would segregate certain of the incoming checks on plaintiff's accounts receivable and withhold them from his regular deposit in the defendant's branch bank. He would later make a separate deposit of these checks in the defendant's main bank, using a duplicate deposit slip which he would later conceal and destroy. Simultaneously with the deposit, or about the same time, he would cash a forged check payable to the bank in the amount of such deposit. The check used would be taken from the last part of the pad because its serial number would not be required for current legitimate purposes. At the end of the month, when he received the plaintiff's bank statement and cancelled checks, he would destroy the forged checks, erase the figures showing the special deposit and corresponding withdrawal, and then erase and change the totals of deposits and withdrawals on the statement, so that the bank's statement and balance appeared to agree with balances on plaintiff's books.

No forged check was ever entered in the cash book. All the checks listed there were legitimate and always in numerical sequence. When the numbers on legitimate checks were getting close to the numbers on the checks previously used in his forgeries, he would request the bank to issue a new pad of checks, beginning with a numbered check, followed by others, which would duplicate the numbered checks that he had already used in his forgeries. The bank ordered and issued such checks. These new checks thus duplicating numbers on the forged checks were then used by Anderson for legitimate purposes. They were entered in proper sequence so that entries in the cash book and the cancelled checks were apparently regular and always available to the accountants upon their monthly examinations. There never was any erasure or break in the sequence or in the listings of the legitimate cancelled checks or in the totals

of the checks in the cash book. However, by constant manipulation of other records of sales, accounts receivable, deposits, and inventory, Anderson was able to keep his accounts in apparent good order and to conceal his forgeries, notwithstanding the audits that were made by the accountants.

Howard Kimball, the president and treasurer, was the only active officer of the plaintiff corporation. His wife, Gladys H. Kimball, never came to the office and she signed checks only when her husband was away. He devoted much of his time outside of the office to the selling end of the business. He never personally audited the bank statements or the plaintiff's books, but he did engage a firm of certified public accountants for that purpose to supervise Anderson's work. That firm made monthly and yearly examinations of plaintiff's books, checks and records during almost all of the period in question. Though not making what accountants technically called a "detailed audit" of *all* the transactions of the plaintiff every month, because it was not customary or practicable in a large jewelry manufacturing and jobbing business like plaintiff's, they nevertheless made examinations of all books, records and checks, together with such other transactions as they deemed necessary in order to ascertain the true condition of the records and business.

These examinations were made independently of Anderson. Neither the accountants nor the plaintiff's officers ever saw any of the forged checks, excepting the last one, which alone was introduced in evidence. However, Anderson testified that such check was a fair sample of all the other forgeries. He explained that he had neither traced the signature of Gladys H. Kimball, nor had it before him when he signed her name; but that he forged it in free hand based upon his recollection of that signature; that he was under great mental and nervous strain while he was writing those signatures; and that the tellers always accepted these checks without question. Only Anderson and the tellers or clerks of the defendant had opportunity to see all of the forged checks. The forgeries were finally revealed by Anderson to

one of the accountants and thereupon a proper notice in writing was promptly given by the plaintiff to the bank. Anderson was later indicted and, upon his confession of guilt and plea of nolo, he was sentenced to prison, where his deposition was taken for use at this trial.

The first forged check was cashed by Anderson and charged to the plaintiff by the defendant in March, 1938. Then followed the other forgeries, amounting in all as follows: Two in 1938, totaling $903.37; four in 1939, totaling $1732.13; twenty-four in 1940, totaling $12,095.35; thirty-three in 1941, totaling $22,979.50; and thirty in 1942 up to August, totaling $23,935.87. Of the total amount of the forged checks, the sum of $27,134.83 represented the amounts paid out by the bank and charged to the plaintiff's account upon forged checks cashed by Anderson prior to August 1, 1941 and therefore more than a year prior to plaintiff's written notice to the defendant. As to these checks a verdict was directed for the defendant in accordance with a special statute of limitations, general laws 1938, chapter 137. The remaining forty-four of the ninety-three forged checks were paid by the defendant and charged to plaintiff's account within a year of such written notice. These, together with interest to the date of verdict, amounted to $39,170.42, which was the total amount of the verdict for the plaintiff.

Under exception 65 the defendant contends that the trial justice erred in denying its motion for a directed verdict. It cites numerous cases as to the law bearing on the relationship between a bank and its depositors and the development of that law under the title "banks and banking". Many of these cases are referred to in 15 A. L. R. 159; 67 A. L. R. 1121; 103 A. L. R. 1147.

From its interpretation of these cases the defendant first states in its brief that the law is well established "that a depositor who has failed to examine cancelled vouchers and statements duly returned to it by its bank and to report to the bank all discrepancies there shown cannot recover *in the absence of negligence on the part of the defendant*." (italics

ours) Upon that premise, the defendant goes on to argue, in substance, that it had affirmatively proven that it was free of any negligence in performing its duty; that the plaintiff was chargeable with notice of what an honest employee would have learned from an examination of the returned statements and vouchers and therefore was guilty of negligence in performing its duty; and that such negligence was the sole proximate cause of the loss that was involved.

The plaintiff, relying on its interpretation of these cases and others hereinafter cited, agrees generally with the defendant's statement of principles but stresses however that where payment by the bank of an unauthorized check has been established, the bank must then prove, by way of an affirmative defense, its own freedom from all negligence *before* it may question the depositor's alleged negligence; and that if the bank is found to have been negligent in the performance of its duty, the depositor may recover regardless of whether it, the depositor, was negligent in the performance of its duty toward the bank.

It would appear, therefore, that the parties are not in serious disagreement as to abstract basic principles governing the relationship of the depositor and its bank, but that they differ on the application of those principles or the method of applying them to the particular facts in the instant case.

We have examined the transcript of evidence and we cannot agree that it was error to deny defendant's motion for a directed verdict. In its argument the defendant seems to overlook entirely our well-established rule that on such a motion the trial justice is required to consider the evidence and reasonable inferences therefrom most favorably to the plaintiff. The defendant's contention, on the contrary, is predicated on a view of the evidence that is most favorable to itself. Moreover, although apparently recognizing certain principles that are well established in the banking law, it nevertheless seems to argue important phases of the case as if it were merely a tort action to be determined in all re-

spects under the doctrines of negligence and due care that prevail in such an action.

We do not agree with that view. The action in the instant case is in assumpsit and should be considered, as far as possible, in accordance with the fundamental rules applicable to that form of action. In this state, as generally, it has been held that in the absence of special arrangement the relationship between depositor and bank ordinarily is that of creditor and debtor. *State* v. *Grills,* 35 R. I. 70. We have found no authority anywhere which disputes the fundamental law that the primary duty of the bank arises from that relationship and that its contract is to pay only those checks that are authorized by the depositor.

The defendant, however, appears to argue for some kind of a modification of that law based upon a depositor's alleged negligence. It is true that principles of negligence and due care have entered into the development of the law governing this type of case; but we think that this is properly so only because the bank relies on them as in the nature of an affirmative defense or in a cross action. Hence special burdens are placed upon the bank in that regard because of the nature of the relationship and its primary duty under the contract. That contractual obligation is not to be confused with or transformed into a duty merely to use due care, or to be completely nullified by modification, as the defendant seems to argue.

This does not mean, however, that a depositor has no duty at all toward the bank, or that a depositor may not be precluded from recovery upon some appropriate principle of law if, in a proper case, certain facts are affirmatively pleaded and shown by the bank. But, in the absence of any contract limitation and where payment by the bank of a forged check has been unquestionably established, there is ample authority that the bank must then affirmatively show that it had exercised due diligence in its transactions with the forger before it can put in issue the depositor's alleged negligence. The substance of that rule is stated or applied

in 7 Am. Jur. 371, §516; *National Dredging Co.* v. *Farmers Bank,* 6 Penn. (Del.) 580; *Basch* v. *Bank of Am. Nat. Trust & Savings Ass'n.,* 22 Cal. 2d, 316; *Wussow* v. *Badger State Bank,* 204 Wis. 467. See *Critten* v. *Chemical Nat. Bank,* 171 N. Y. 219; *Leather Manufacturers' Bank* v. *Morgan,* 117 U. S. 96. In the event that the bank is found, upon the evidence, to have been negligent in the performance of its duty, the bank becomes liable because of its primary contractual obligation and not because of its negligence.

The courts in various jurisdictions, apparently in an effort to reach a just result, are not agreed on the reasoning or the legal principles in accordance with which a bank may save itself from the consequences of its payment, in violation of its agreement, of unauthorized checks. See *Deer Island Fish & Oyster Co.* v. *First Nat. Bank,* 166 Miss. 162; *Wussow* v. *Badger State Bank, supra.*

Whatever may be the grounds upon which the law is applied in the various cases that are cited, we think that in the absence of contract limitation and where it has been established that the bank has paid a depositor's check on which the signature was forged, the question of the bank's freedom from negligence is a preliminary one to be determined *before* the bank has the right to put in issue the depositor's alleged negligence. On this issue, as on the depositor's alleged negligence in failing to examine returned bank statements and to report errors within a reasonable time, the burden of proof is on the bank and ordinarily such questions are for the jury to determine in the first instance.

Keeping these principles in mind, we have examined the evidence in the instant case. From that examination we cannot say that the only reasonable conclusion to be drawn from all of the evidence, if considered most favorably to the plaintiff, was that the bank had shown itself to be entirely free of negligence in all of the transactions with the forger; and that the plaintiff was negligent in the performance of its duty and that such negligence was the sole proximate cause of the whole loss involved herein. There was unde-

niably payment by the bank of these ninety-three checks, none of which was authorized by any officer of the plaintiff; and all of these were established by undisputed evidence as having signatures that had been forged by Anderson. Their payment was plainly in violation of the defendant's primary obligation under its contract. Signature cards were readily available but were never used, so far as the evidence shows, to verify the signature on any forged check.

The jury might reasonably have found that if the checks had been compared with the signature cards, a reasonably careful teller would probably have detected the forgeries and would not have cashed the checks. One of the bank's witnesses, in explaining how the examination of such signature was made, testified: "You would go to the bookkeeping department and would take a group of her checks that she has posted to the ledgers, and then you would more or less just run through casually and slowly and look at the signatures very carefully—". Whether the tellers and clerks used reasonable diligence in forming their mental picture of the plaintiff's signature as a standard, and whether due care was used in examining the signature on the checks in the above-quoted manner were questions that were open to different inferences.

The volume of examination and work required of the tellers and clerks might have been found by the jury to sufficiently explain how it was possible for Anderson to deceive five persons in the bank on each of the ninety-three separate transactions. But that evidence would not require the jury to find that the system was adequate and that it was applied to each of these forged checks with due diligence, so as to excuse the bank. At least a jury might have inferred from this and other evidence that the bank did not exercise the care ordinarily required of a prudent bank in view of the relationship, the nature of its business, and all the existing circumstances.

Moreover, if the bank was found to have been free of negligence in performing its duty, so as to entitle it to question

the plaintiff's conduct, there was evidence from which the
jury would have to determine, among other facts, whether
the depositor had reasonably fulfilled its duty to the bank
when it hired competent certified accountants to supervise
and audit the company's books, checks and accounts inde-
pendently of Anderson and in the manner shown by the
evidence; and whether plaintiff's negligence, if any, was the
sole proximate cause of the loss, especially in view of the
evidence that the bank had furnished and made available
to Anderson duplicate numbered checks, which duplication
was a material factor in his plan and in his successful con-
cealment of the frauds from the plaintiff and its accountants.
From such evidence, the jury, while not required to so find,
might yet have reasonably found that the bank, though
unwittingly, had nevertheless assisted Anderson to conceal
the frauds from plaintiff and its accountants; or that the
bank by exercising due care could have detected the forger-
ies regardless of the depositor's negligence, if any.

On the other hand if the jury had found that Anderson, a
skilled and clever accountant who had turned forger, had
deceived both the bank and the depositor under circum-
stances that would free both parties of any culpable negli-
gence, which was another reasonable inference from the
evidence, then the case would be determined on the bank's
liability under its primary contractural obligation. In our
opinion, therefore, it was not error for the trial justice to
deny the defendant's motion for a directed verdict, and its
exception numbered 65 is overruled.

The defendant argues all its other exceptions under three
categories: (1) To the trial court's instructions to the jury
and its refusal to charge as requested; (2) to miscellaneous
rulings in connection with the presentation of evidence;
(3) to the denial of the defendant's motion for a new trial.

Under the first category the defendant contends chiefly
that the trial court erred in instructing the jury that "de-
fendant bank, being in effect a trustee, must employ the
highest degree of care". We find no place in the charge

where the defendant was definitely described as a trustee or as being in effect a trustee; nor any express instruction that the defendant must employ "the highest degree of care".

In support of its contention the defendant brings closely together in its brief several expressions that are found in different parts of the charge concerning the bank's duty. Among them are expressions that it was the bank's duty "to use great care" or "to be very careful" or "to use not ordinary care but great care in handling the funds which are entrusted to it by its depositors". The defendant places great stress upon the word "entrusted" in the last of these expressions. But in our opinion it requires unreasonable emphasis to transform the word entrusted, as used and as probably understood by the jury, to stand for a charge that the "defendant bank being in effect a trustee, must employ the highest degree of care."

This is especially true when the various expressions used throughout the charge are read and considered together with the other related specific charges and illustrations. In connection with these expressions the defendant ignores several specific charges and examples that were given by the trial justice to illustrate the defendant's duty. He specifically charged that the bank was not an insurer; that the plaintiff had a duty to the bank to examine the returned bank statements; that it could not assume that the bank would be liable under all circumstances; that liability on one check would not necessarily make the bank liable on others; and that the defendant's duty was to use the care which would reasonably have been required on the part of the bank. He gave no charge that there were degrees of care. The quoted expressions were used in connection with examples to illustrate their meaning. When read together with such illustrations they give a wholly different impression from that gathered by the grouping as found in the defendant's brief. Considered as a whole these expressions would naturally be understood by a jury as a practical statement that due care varies with the circumstances; and that the bank's duty,

having in mind the nature of its business and its relationship with depositors, was to use that care which is ordinarily required of a prudent bank under circumstances that existed here.

Moreover, there were some portions of the charge which were favorable to the defendant, especially in relation to the burden of proof. This burden to establish that it was free from negligence in performing its duty *before* it was entitled to question the plaintiff's alleged negligence was not specifically placed on the bank as required by law. On the contrary the plaintiff was required to carry the burden and to establish its case on all issues. In that respect the charge was prejudicial to the plaintiff but not prejudicial to the defendant.

The defendant also excepted to a charge, in substance and effect, that the expert accountants hired by plaintiff to make monthly and yearly audits of its books, checks and accounts were independent contractors and not employees in the ordinary sense, and that therefore their negligence, if any, was not imputable to plaintiff *if* the latter had used reasonable care in employing them and *if* they were accountants of standing entitled to confidence as viewed by an ordinarily prudent business person.

According to the ordinary standards of determining an independent contractor, as distinguished from an employee or agent, the firm of accountants here was clearly an independent contractor. In our opinion the charge did not permit the plaintiff to delegate its real duty, as defendant contends. It left to the jury the determination of whether plaintiff had used reasonable care in selecting these accountants and in performing its duty to the bank. A depositor is not required to make a personal examination of his books and records in order to satisfy his duty to the bank. Apparently in the absence of special circumstances such duty may be satisfied if the depositor in good faith uses reasonable care in selecting a competent and skilled person to make such examination. 7 Am. Jur. §513 and cases cited. Whether

a depositor has done so is ordinarily a question of fact. In our opinion this charge was not prejudicial in the circumstances of this case.

So far as the defendant's special requests for instructions are concerned, including the fifteenth, they appear to have been granted in the language of the defendant or substantially covered in the general charge, which is sufficient to satisfy the rule. So far as they were denied, they appear to be incorrect statements of the law or, if correct, to be not complete enough or adequate in the circumstances of this case to avoid their misleading and confusing the jury. The exceptions of the defendant dealing with the instructions given to the jury and with the denial of the defendant's requests to charge are therefore overruled.

The second category of exceptions relates to miscellaneous rulings concerning the presentation of evidence. These include rulings excluding a series of questions that were asked of several witnesses. They called for the witnesses' opinions on whether the bank in stated circumstances had used due care. In addition to being mere conclusions and opinions of the witnesses, they were objectionable because they invaded the jury's province and were properly excluded. Another group of questions also called for opinions from each handwriting expert but not as to the fact of forgery, which was nowhere denied in any of the instances involved. They simply sought to present expert opinions as to whether the forgery, which was admittedly established by the check in evidence, was a good imitation of the genuine signature that would deceive a reasonably careful teller. In our opinion this also invaded the province of the jury whose duty it was to decide that question on the admitted evidence and there was nothing that required expert opinion or that would make the exclusion thereof prejudicial error. The other exceptions in this category have been examined and in our opinion are without merit.

The third category argued by defendant is restricted to one exception, to the denial of its motion for a new trial. The

defendant repeats substantially the same arguments that were presented under its motion for a directed verdict. There were no special findings requested, and none was made by the jury. The general verdict therefore implies findings favorable to the plaintiff on all material issues including that of defendant's failure to use due care. From our examination we do not find that the trial justice misconceived or overlooked material evidence in reaching his independent conclusion that the verdict was supported by a preponderance of the evidence. It is true, as the defendant contends, that he injected into his decision from the bench a remark that might imply that he believed the bank to be a trustee of the depositors' funds. This, of course, is not in accordance with the established law; nor is it stated in the terms that were charged to the jury. It is immaterial what the trial justice, at the time he was passing on a motion for a new trial, believed the law should be. At that time he is bound to follow the law as stated by him in his charge to the jury and to pass his independent judgment upon the evidence and weight thereof in accordance with that law.

If that one misstatement in the trial justice's decision, concerning the technical relationship between the bank and its depositor, is sufficient to deprive the decision of the weight ordinarily given to his approval of a verdict based on conflicting evidence, then we are required to examine the evidence for ourselves without the assistance of seeing and hearing the witnesses. In such circumstances, however, the rule governing an appellate court is different from that which applies to the duty of the trial justice upon such a motion; and we must find that the evidence in the transcript strongly preponderates against the verdict before we should set it aside. *Baker* v. *Kinnecom,* 68 R. I. 453.

Accordingly we have made an independent examination of the transcript of evidence and we cannot say that the credible evidence strongly preponderates against the jury's verdict or that it requires us to conclude that substantial justice between the parties was not done by the verdict.

Under these circumstances, exception 97 is overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for entry of judgment on the verdict.

*Swan, Keeney & Smith, Eugene J. Phillips, Charles E. Tilley, Marshall Swan,* for plaintiff.

*Tillinghast, Collins & Tanner, Harold E. Staples, Russell P. Jones, Henry W. Rigby,* for defendant.