UNION WHOLESALE COMPANY, a corporation of the State of Delaware, Plaintiff, v. BANK OF DELAWARE, a banking corporation of the State of Delaware, Defendant.

(*April* 25, 1963.)

Lynch, J., sitting.

*Thomas J. Healy, Jr.* (of Metten, Healy and Collins) for Plaintiff.

*William Prickett, Jr.*, and *B. Wilson Redfearn* (of Prickett, Prickett and Tybout) for Defendant.

Superior Court for New Castle County, No. 1200, Civil Action, 1959.

Lynch, J.:

Plaintiff,[1] a bank depositor, has sued the defendant bank[1], to recover money paid out by the Bank on checks forged by an employee of the Plaintiff.

The case was tried by a Court and Jury on February 6 and 7, 1963, resulting in a jury verdict for the Bank. The

---

[1]The parties will be referred to hereafter as Plaintiff and Bank.

Plaintiff filed a motion on or about February 15, 1963, which motion was titled "Motion to Set Aside Verdict and Judgment Thereon and Motion for New Trial Pursuant to Rules 50 and 59".

A post trial review of the evidence shows there is no conflict in the testimony; each party introduced such testimony as it considered relevant and material to its side, and the jury found for the Bank.

The Plaintiff's employee was Percy W. Landon. He was in Plaintiff's employ from July 25, 1958 until November 13, 1958. He acted in a clerical capacity, in handling the general office work, answering phone calls, and preparing checks for signatures of Plaintiff's officers, after which the checks were mailed; Landon also made up deposit slips, which deposits were mailed to the Bank. Landon did some typing, and opened the mail; he was directed to verify the bank statements. The only other man in Plaintiff's office was a James F. McLaughlin, who was a Vice President; he was the Office and Sales Manager. The evidence is clear that he had no supervision of checks or verifying bank statements; such work was carried out by another officer, director and stockholder of Plaintiff who was a Certified Public Accountant, whose firm was Plaintiff's auditor, and this firm did the Plaintiff's general bookkeeping and made quarterly audits of its records, at which times bank statements and the cancelled checks were verified.

Plaintiff's checks were in three parts. The top sheet or part was the check used for directing payment of its funds by the Bank; the second sheet (or copy) was attached to invoices or journal entries, showing how funds were disbursed and so filed; the third sheet (or copy) was intended for a "check file"—comparable to what is generally regarded as the stub in a check book.

During the period of Landon's employment with Plaintiff he forged and cashed six checks as shown below:

| Number | Date of Check | Date Cashed | Payee | Amount |
|--------|---------------|-------------|-------|--------|
| 839 | 8/20/58 | 8/21/58 | Clifford Pundore | $ 400. |
| 898 | 8/22/58 | 8/22/58 | Percy W. Landon | 2,000 |
| 896 | 8/30/58 | 9/2/58 | Percy W. Landon | 1,500 |
| 897 | 10/1/58 | 10/2/58 | Percy W. Landon | 3,000 |
| 947 | 10/20/58 | 10/21/58 | Percy W. Landon | 500. |
| 945 | 11/1/58 | 11/6/58 | Percy W. Landon | 500. |
| | | | | $7,900. |

In all of the above checks Landon forged Mr. McLaughlin's name and in all cases the checks were drawn against Plaintiff's account at the Bank. The Bank sent monthly bank statements to Plaintiff three times while Landon was employed by Plaintiff and prior to November 13, 1962, the date of the discovery of the forgeries. These bank statements were sent shortly after September 1, 1962, shortly after October 1, 1962, and shortly after November 1, 1962.

When the bank statements were received it was Landon's duty to open such mail and place the statements on McLaughlin's desk for review, *i.e.*, for McLaughlin to see if the checks were made out to legitimate parties. In light of Landon's duties this permitted him the opportunity to remove the cancelled forged checks when he opened the mail, and McLaughlin would not see any forged checks as he did not verify the statements with the check file because such was not one of his duties. Thus McLaughlin never saw the forged checks.

The fact of the forgeries was not brought to his attention until the audit of the Plaintiff's books, made early in November of 1958. During this audit returned checks which had been torn in half by Landon were discovered by the auditor, and these torn checks led to the discovery of the six forgeries.

Plaintiff sued Bank for the total of the amounts paid out by the Bank on all six checks.

It is not the Bank's position that it is liable to Plaintiff for the first three checks, totaling $3,900.00, but that it is not liable to Plaintiff for the payment of the last three checks, inasmuch as these checks were paid out by the Bank subsequent to Plaintiff's having received its bank statements in September, October and November of 1958 showing the initial forgeries. The Bank urges that the primary causation for such losses resulted from negligence on Plaintiff's part, which was a breach of duty which Plaintiff owed to the Bank.

Before considering what may be said to be the controlling legal principles which will determine Plaintiff's motions, it seems necessary, or at least desirable, to review all the evidence, and to note that before Plaintiff hired Landon that Plaintiff had checked Landon and his references. It stands unchallenged that Landon made a good appearance; he was a college graduate; and he had been an officer in the United States Army. His references were three clergymen of his faith; an officer from the Masonic Lodge of which he too was an officer, and a former employer, he gave him a good reference. Landon had a personal bank account with the defendant Bank, with a small balance; he was known by sight and in a general and casual way by some bank personnel. The Masonic Lodge of which Landon was an officer also maintained an account with defendant Bank and Landon was one of the official signatories on the checks issued by the Lodge.

It seems further desirable to point out that the Bank, when it opened accounts, always required duplicate signature cards of authorized signatories on checks, one of which cards was kept at the Main Office and the other at the Branch (there were 5 such branches) where the account was opened; that when a check is presented to a bank teller for cashing the teller has the duplicate signature card for verification and it

is always available to the Bank's bookkeeping department to verify the signature before depositor's account is charged with payment of the check. It developed that signature cards were not maintained at all branches. The chief teller of the Bank testified that tellers are instructed to be careful about paying checks, in large amounts, and that they could always go to an officer to have a signature on a check verified. It was made to appear that no teller who cashed the forged checks ever verified the signatures with the signature cards or consulted an officer for verification of the signatures on these forged checks.

It further seems desirable to note the Bank sent monthly statements to Plaintiff, reflecting the amounts of the deposits made and the checks charged against the account, and the cancelled checks accompanied such statements; and that a legend appeared on all such statements directing depositor to notify Bank within 10 days if there were irregularities and the Bank then argues a duty arose on depositor's part to verify the statements with depositor's records and to report any forgeries or irregularities.

The Bank contended that since it had had no advices from Plaintiff after the August, September and October statements had been mailed in early September, in early October, and early November, it could assume there had been no forgeries or irregularities in the account.

Since we are concerned only with the checks numbered 897, 947 and 945—all of which were in large amounts—it seems desirable that the Court review the evidence relating to the cashing of these three checks.

All these checks were cashed at the Bank's places of business. Check No. 897 was for $3,000; it was cashed by the teller on October 2, 1958 at the 6th and Market Street Branch, at the cage where weekly pay roll checks are handled. This teller had died before the trial.

Another teller, occupying the same cage—the so-called "payroll cage"—was aware of the cashing of this $3,000 check, and this teller testified:

"Q And when you say that you had the job of making up the payrolls, can you tell us what that involved in general?

"A Well, a lot of your companies still pay by cash rather than check, and they call in the denominations, twenties, tens, fives, and change, and we in turn would make it up for them, and then they would come in and present the check for the payroll and we would give them the cash.

"Q Now, at that time was the 6th Street Branch kind of in the center of the downtown commercial center?

"A That is right.

 * * * * * *

"Q * * *. Did Mr. Chandler cash one of these checks?

"A Yes, he did.

"Q Which one did he cash?

"A I am not sure, but I think it was the $3,000 one.

"Q Now, do you happen to remember what his Teller Number was?

"A It was No. 1

"Q So that the way to identify the check that he would cash would be by seeing if there was a No. 1 on the check, is that right?

"A That is right.

"Q Now, when you cashed this check did you know Mr. Landon?

"A Yes, I did.

"Q Had he dealt with the Bank on prior occasions?

"A Yes, he had.

"Q And had he dealt in connection with the account of the Hiram Grand Lodge?

"A Yes.

"Q And had he presented checks to be cashed for the Lodge?

"A Yes, he had.

"Q And do you know, or do you recollect whether he had ever cashed checks on his personal account at your particular branch?

"A Well, I couldn't swear to that. I don't remember whether he did or not. But he was in the Bank quite frequently.

"Q Now, what sort of a person was Percy Landon?

"A He was very friendly, very well dressed, very soft-spoken, and made a nice appearance. And he was somebody that, I mean, you wouldn't forget.

\* \* \* \* \* \*

"THE COURT: What experience had you had prior to September 2 of 1958 as related to Mr. Landon and the Union Wholesale Co.?

"THE WITNESS: Well, I knew he worked for the Union, and he made deposits in his own account and for the Hiram Lodge.

"THE COURT: Had you known any deposits he had made for Union?

"THE WITNESS: No, I couldn't swear to that, sir.

"THE COURT: Had he presented any prior checks for Union?

"THE WITNESS: Not to my knowledge.

* * * * * * .

"Q And a short time later were you present when Mr. Chandler paid the Check No. 897 dated October 2, 1958, for $3,000, that has been identified or admitted in evidence as Plaintiff's Exhibit No. 4?

"A Yes, I was.

* * * * * *

"THE COURT: Do you have any recollection now as to when you first associated in your mind the fact that Landon was an employee of Union?

"THE WITNESS: No, I couldn't tell you that.

"THE COURT: Is there anything about any particular act that associates Landon in your mind with the Union account?

"THE WITNESS: No."

In the course of cross examination this teller stated:

"Q Isn't it normal if a business is going to pay in cash, and they are going to send over a substantial check with which to make up the payroll, that they call you in advance and give you a breakdown on how they want that money?

"A Sometimes. Most of the time.

"Q So many tens, fives, and so forth?

"A Yes.

"Q Now, further, how do they formally make those out? If you have a business that is sending up a check that will be

cashed, do they make it out to the clerk that works in the office? Do they make it out to payroll account, or how do they do it?

"A Most of the time it is made out to the Bank of Delaware, or payroll account.

"Q So it wouldn't be made in the normal case to an individual who worked, who came down to get the money?

"A No.

"Q Now, you didn't get a call on this account with regard to the $3,000 check on 8-22 asking for a breakdown, did you?

"A No.

\* \* \* \* \* \*

"Q Now, didn't you think anything unusual of paying Mr. Landon $2,000 [one of the first three checks cashed by Landon] on Union Wholesale's account?

"A No, I did not. I knew the account was good.

"Q But you didn't know whether the signature on the check was good, did you?

"A No, I didn't.

"Q You had no way of telling that?

"A I had no way of telling that.

"THE COURT: Where was the signature kept?

"THE WITNESS: For Mr. Landon one would have been at 9th and Market, I guess.

"MR. HEALY: And one at 6th?

"THE WITNESS: I am not sure. It seems to me they would both be at the 9th and Market. The account was opened at 9th and Market.

\* \* \* \* \* \*

"Q Have you ever gone to the length on a check of calling up the maker of a check and asking him whether or not he gave a check for a thousand or two thousand dollars?

"A No.

"Q In other words, your testimony is like that of Mr. Truax [the teller at the Merchandise Mart], if you know the person in a casual manner and they present a check regular on its face and that account has sufficient funds in it, you will cash it for them?

"A Yes, sir."

Check No. 945 for $500 was cashed by a teller at the Merchandise Mart Branch on November 6, 1958. $50 was credited to Landon's "popular account" and the balance of $450 paid out in cash to Landon. This teller conceded he had not verified the signature on this check because no signature card was available there, nor did he consult a bank officer about the check. The teller was aware that some of Landon's checks on the "popular account" had been returned for "insufficient funds". This teller had never cashed any other of the forged checks for Landon. He did not know of any other checks which Landon had cashed on Plaintiff's account, except possibly some payroll checks.

A few questions and answers given by this teller do seem significant:

"Q You further didn't know, or care, as Mr. Pruitt said, whether or not any statements had ever gone back to Union Wholesale with any checks that Landon had cashed?

"A I didn't have the slightest knowledge.

\* \* \* \* \* \*

"Q Now, Mr. Truax, didn't you feel that it was unusual that a man who had a popular checking account, which you

stated you knew had been overdrawn on several occasions, all of a sudden showed up with a check for $500 to cash?

"A Not necessarily, and there was no reason I should dishonor it.

"Q In other words, you didn't give it a thought?

"A Well, no, not really.

"Q Suppose the check had been for $3,000 rather than $500. Would you have ——

"A Still there would be no reason on a personal ——

"Q In other words, you would go right ahead and cash it?

\*　\*　\*　\*　\*　\*

"A There was was no reason for even $3,000 to dishonor the check.

"Q In other words, if this check had been presented and it was for $3,000, you would have gone right ahead and cashed it for Landon?

"A After checking the balance in the account.

"Q You would have just checked the balance in the account?

"A That would have been about the only check I could make.

"THE COURT: Wait a minute, Mr. Healy.

"Am I to understand that you would have no way of verifying the maker at the Merchandise Mart?

"THE WITNESS: I couldn't verify the signature of the maker. I could verify who the proper signature would be, whose signature it would be.

"THE COURT: Assume he signed in the name of an unauthorized, or a duly directed or appointed signator, but there was nothing you had at the Merchandise Mart which would help you in determining whether or not this Check 945 was in fact, or had in fact been signed by Mr. McLaughlin or not, is that right?

"THE WITNESS: I would have no knowledge of that.

\* \* . \* \* \* \*

"Q Then you say, Mr. Truax, the only thing you are interested in is: One, if you know the person, Two, if the check is regular on its face, you will cash it?

"A And if there are sufficient funds in the account and the payee, or last endorser has sufficient identification.

"Q Then you think it is up to somebody in Bookkeeping to check and see if the signature is valid?

"A That is right. This is the way it has to be done."

No other witness testified for the Bank of having verified or questioned the signatures on the three forged checks cashed by Landon and under consideration. No teller or bookkeeper testified of having compared the signatures on the forged checks with the signature cards furnished by Plaintiff when it opened its account with the Bank and kept at the Main Office.

Before proceeding to state what legal principles are determinative, the Court takes note of the factual contentions advanced by the Bank, *i.e.*:

1. Did the Bank sustain its burden of proving its own freedom from negligence?

2. Was the "ten day" clause on the bank statement admissible evidence and to what extent is it effective?

Many contentions and arguments were advanced by the parties; all have been considered, but the Court has con-

cluded the pending motions can be determined solely on the phase of the sufficiency of the evidence to sustain the jury's verdict.

 Since, as has been previously stated, see *supra* page 762, there is no conflict on any material point in the testimony, the Court proposes to consider such evidence and determine as a matter of law if the Plaintiff's motions should or should not be granted as the law provides.

Rule 50(a) and (b), Rules of the Superior Court, *Del. C.*, is now authority for a Trial Court to consider, after trial, if motions for directed verdict, made in the course of the trial should be considered and determined.

It has been frequently stated and ruled by the Delaware Courts, that when the evidence as considered in light of the law is productive of one legal result, it is the duty of the Court to direct a verdict accordingly. This rule was effective before the adoption of the present rules, *Coe v. Johnson,* 6 Houst. 9 (Ct. of Er. & Ap., 1880), *Taylor v. DuPont Bldg. Corp.,* 6 Boyce 277, 281, 99 A. 284 (Super. Ct. 1916) aff'd. 6 Boyce 294, 99 A. 286 (Sup. Ct. 1916), citing *Philadelphia B. & W. R. R. Co. v. Gatta,* 4 Boyce 38, 56, 85 A. 721, 729 (Sup. Ct. 1913). In this last cited case at the page noted, then Judge Wooley, speaking for the Supreme Court, stated:

"When the evidence in a case is admitted or not controverted and when the law as applied to that evidence is productive of but one legal result, it becomes the duty of the court in the administration of justice, to bind the jury to render a verdict accordingly. To do otherwise would simply entail a postponement of the proper decision of the case, by a retrial ordered on a motion for a new trial, in the event the jury found against the facts. Thus when it appears by a verdict that admitted facts were ignored by the jury, or the instructions upon the law were disregarded, or a clear error or calculation was made, the court will set aside the verdict, or to avoid this,

when possible, the court will direct the jury to render the only verdict that could legally be sustained. * * *."

A like result has been reached since the adoption of our present rules and under the cited rule, see *McCarthy v. Mayor and Council of Wilmington*, 9 Terry 201, 203, 100 A. 2d 739 (Super. Ct., 1954).

The liability of banks where a depositor's funds have been paid out on a forged check or checks is clear and well established, 6 *Del. C.* § 123, codifying the provisions of 26 *Del. Laws*, Chapter 191, the title of which chapter was "An Act to make uniform the law of negotiable instruments". Section 23 (appearing 26 *Del. Laws* at page 406) now 6 *Del. C.* § 123, states the now applicable law:

"Section 23. When a signature is forged * * *, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

The law generally applicable to forged checks and the liability of banks to depositors where moneys are paid out on such forged checks is to be found in *Michie on Banks and Banking* (Perm. Ed.) Vol. 5B, Ch. 9, § 274; *Zollman on Banks and Banking* (Perm. Ed.) Vol. 6, Ch. 147, § 4122; *Beutel's Brannan, Negotiable Inst. Law* (7th Ed.), pp. 127, 437, 442-444; *Brady*[2] *on Bank Checks*, 2d Ed., Ch. XI, §§ 149, 151, 180, 181 and 182; Vol. 5, *Uniform Laws Annotated*, Part 1, page 224 *et seq.*; 9 *C. J. S.* Banks and Banking § 556 and 7 *Am. Jur.*—Banks and Banking—§ 574.

---

[2]The author notes, § 185, that many states have enacted a statute requiring depositors to give notice of "forged checks" within a specified time, otherwise the bank is absolved from liability. Delaware has not adopted such a statute.

■ Thus, it can be accepted that the Bank is liable to Plaintiff unless it can show (1) that it exercised due diligence in the manner of conducting its operations; (2) that the depositor itself was negligent in not verifying bank statements with its own records, and (3) such negligence was the proximate cause of the bank paying out the sums on the forged checks presented, as here, by Landon.

The above authorities essentially state the rule of law which was adopted by our Supreme Court in *National Dredging Co. v. President etc. of Farmers' Bank*, 6 Pennewill 580, 69 A. 607 (1908)—before adoption of the N.I.L.—see *supra* p. 18. This case involved the liability of banks making payments of checks which had been altered, after they had been prepared and completed, by a trusted officer of a corporate depositor and signed by an authorized signatory in a bank.

Section 124 of the Negotiable Instruments Law, 6 *Del. C.* § 224 reads as follows:

"Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is voided, except as against a party who has himself made, authorized or assented to the alteration, and subsequent indorsers.

"But when an instrument has been materially altered and is in the hands of a holder in due course, not a party to the alteration, he may enforce payment thereof according to its original tenor."

■ Since the *National Dredging Company* case did not involve " a holder in due course, not a party to the alteration", it is entirely proper for the Court to consider what was decided in that case, and look to it for guidance here, since the liability of a bank in paying such a check is the same in fact whether the check is forged or altered.

In the *National Dredging Company* case, the Supreme Court of this State laid down these principles:

1. 6 Pennewill 580, 587, 69 A. 607, 610:

"In the absence of * * * negligence or misleading conduct on the part of a depositor, a bank * * * cannot charge the depositor with any payments, except such as are made in conformity with his orders; for the relation of a bank and its depositors is one simply of debtor and creditor, and it matters not what care is exercised and what precautions are taken by the bank, no payment made otherwise can be charged against the depositor, even though it be made in consequence of forgeries so skilfully executed as to deceive the most expert, or by false pretenses so adroit and plausible as to be likely to impose upon experienced bank officers."

2. 6 Pennewill 580, 589, 69 A. 607, 610 (quoting from the language of Mr. Justice Harlan of the United States Supreme Court):

" 'While it is true that the relation of a bank and its depositor is one simply of debtor and creditor (*Phoenix Bank v. Risley*, 111 U. S. 125, 127, 4 Sup. Ct. 322, 28 L. Ed. 374), and that the depositor is not chargeable with any payments except such as are made in conformity with his orders, it is within common knowledge that the object of a pass book is to inform the depositor from time to time of the condition of his account as it appears upon the books of the bank. It not only enables him to discover errors to his prejudice, but supplies evidence in his favor in the event of litigation or dispute with the bank. In this way it operates to protect him against the carelessness or fraud of the bank. The sending of his pass book to be written up and returned with the voucher is therefore in effect a demand to know what the bank claims to be the state of his account; and the return of the book, with the vouchers, is the answer to that demand, and in effect imports a request by the bank that the depositor will in proper time examine the account so rendered, and either sanction or repudiate it. * * *' "

3. Continuing from and on the same pages:

" "* * * The depositor cannot, therefore, without injustice to the bank, omit all examination of his account, when thus rendered at his request. His failure to make it, or to have it made, within a reasonable time after opportunity given for that purpose, is inconsistent with the object for which he obtains and uses a pass book.' "

4. The Supreme Court took cognizance of what Judge Spruance had said in his dissenting opinion in the Superior Court, 6 Pennewill at 591, 69 A. 611, *viz.*:

" 'Of course, if the defendant's officers, before paying the * * * checks, could by proper care * * * have detected the forgeries, then it cannot receive a credit for * * * these checks, even if the depositor omitted all examination of his account.' " And then said:

"If this is a correct statement of the law, such subsequent negligence on the part of the depositor is not a bar to recovery, unless it be also determined that there was no negligence on the part of the officers of the bank in paying the * * * checks and, therefore, Judge Spruance is correct when he states elsewhere in his opinion: 'The first and important question is whether there is any evidence that would warrant the jury in inferring and finding that the bank did not use due and reasonable care and diligence to discover that these checks, or some of them, had been fraudulently altered.'

*"In every case where suit is brought by a depositor to recover from a bank money deposited by him, which the bank has paid out otherwise than in conformity with his orders, and the bank sets up the defense that it is nevertheless entitled to charge the depositor with such payments, because of conduct of the depositor subsequent to such payment, the preliminary question to be determined is whether the bank was or was not guilty of negligence in making the payments.*

*If it were negligent, if its officers be found to have failed to exercise due and reasonable care in detecting the forgery or fraud, then the subsequent negligence of the depositor, his failure to perform his duty in examining his pass book and vouchers with reasonable care and report to the bank in a reasonable time any errors or mistakes, would constitute no defense.*" (Emphasis supplied)

 It now becomes necessary, in light of the aforecited legal principles, for the Court to review again ànd consider the bank's evidence to determine if the bank "* * * was or was not guilty of negligence in making the payments", 6 Pennewill at p. 591, 69 A. at p. 611, because—as the Supreme Court said:

"* * * If it were negligent, if its officers be found to have failed to exercise due and reasonable care in detecting the forgery * * *, then the subsequent negligence of the depositor * * * would constitute no defense."

No one gave any testimony directly showing the Bank defense; the defense, such as it presented, came from Bank witnesses; it was entirely circumstantial and on review unconvincing. It did not present substantiation of the evidence as was given by Mr. Pruitt—whose testimony went no further than to outline proper banking practices to be followed by the Bank—without some substantiation that such banking practices were carried out and made effective by Bank personnel handling the cashing of checks. See *R. H. Kimball, Inc. v. Rhode Island Hospital Nat. Bank,* 72 R. I. 144, 48 A. 2d 420, 423—at which page the Rhode Island Supreme Court noted:

"The bank had an established system for examining depositors' checks. The tellers were expected to have, from study and experience, a knowledge of the signature of each depositor and were expected to examine each check, when presented, to determine the authenticity of the signature. * * * by comparing the signature on each check with * * * that depositor's

signature. * * * There was no evidence that any teller, clerk or officer ever used the plaintiff's signature card by which to verify the signature on any of these forged checks; nor is there specific evidence that any of the * * * checks was actually and individually inspected according to the bank's system. Apparently * * * the tellers' confidence in [Landon] entered into the composite mental picture which was used as a standard in passing upon the signatures on the forged checks." See also *German Security Bank v. McGarry,* 106 Ala. 633, 17 So. 704 (Sup. Ct. Alabama, 1895); *Liberty Bank & Trust Co. v. Hand,* 269 Ky. 342, 107 S. W. 2d 285, 286 (Ky. Ct. of Appeals, 1937) and *Commercial Bank of Albany v. Strong,* 28 Vt. 316, 322. These cases considered what was sufficient circumstantial evidence of effectuation of a given banking practice and they all held that it is necessary—not only to show what the practice was—but that it was carried out by bank personnel. This was not done here as is evident from an examination of the Bank's evidence. The evidence of the witnesses Truax and Records (Bank employees) showed not only did they not carry out the practices such as Mr. Pruitt recited, but their testimony shows they acted to the contrary, and disregarded the practices. This is made evident in the review of their testimony appearing *supra,* page 764. The only tests they applied were (1) did the account have sufficient funds and (2) did they have some casual knowledge of the man presenting the check for cashing.

If the Bank is to rely on circumstantial evidence to show it was not negligent it must meet the requirements of the circumstantial evidence rule such as now is in effect in this State, see *Wilson v. Derrickson, et al.,* 4 Storey 199, 175 A. 2d 400, 402 (Sup. Ct. 1961). This, the Bank has not done, and so it did not substantiate the first part of its defense. The Court, therefore, grants Plaintiff's motion for judgment; it must be and is hereby granted.

Having reached this conclusion it becomes unnecessary for the Court to consider and determine any of the other questions that were raised or arguments made.

As a matter of fact the Court felt impelled at the conclusion of the trial to grant Plaintiff's motions for a directed verdict but was in doubt because Landon, the unfaithful employee, was the person designated by Plaintiff in the first instance to verify the bank statements. That he must have examined them is evident from the fact that Mr. McLaughlin was never made aware of Landon's forged checks. The Court considered at the trial this designation of duty to Landon may have been evidence of negligence on Plaintiff's part.

Post trial research has shown, however, that, as a matter of law, it is not negligence on a depositor's part to designate the unfaithful employee to verify the bank statements if the depositor was not aware of his actions while the forgeries were being perpetrated.

In *Deer Island Fish & Oyster Co. v. First Nat. Bank*, 166 Miss. 162, 146 So. 116 (1933) that Court said, 146 So. at p. 120:

"* * * A depositor owes the bank the duty of reasonable care in verifying his vouchers and returned checks furnished him by the bank within a reasonable time. If, by such examination, a reasonably prudent business man ought to have discovered the forgery and have reported same to the bank, then, in that event, his negligence constitutes a defense for the bank. * * * *A depositor may intrust this duty to a competent, honest bookkeeper, or to an employee whom he, in good faith, believes to be honest and competent. * * * It has been thought that a bank engaging in the business of depositing and paying out money on checks * * * is equipped to discover forgeries and to safely preserve its depositors' money. The bank holds out to the public that its officers and agents are skilled in all matters connected with, and relating to, its ability to detect and prevent forgery.*

*"* * * the right of the bank to avail itself of the defense of negligence on the part of the depositor should only be accorded in the event the jury should find as a fact that, the bank was not negligent."* (Emphasis supplied)

See *National Dredging Co. v. Farmers Bank, supra,* pages 22, 23.

Looking back in retrospect, the Court realizes it should have granted Plaintiff's motion for a directed verdict at the conclusion of the trial as there were no questions to be resolved by the jury with respect to the Bank's negligence; this had been demonstrated by its own witnesses and general lack of evidence.

An order may be presented providing for judgment for Plaintiff and against the Bank for the sum represented by all the forged checks, together with interest from the date of payment of each forged check by the Bank to the date when judgment is to be entered. Costs are likewise to be assessed against the Bank.